*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0443p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee,*

　　*v.*

DAVID GARNER,

　　　　　　　*Defendant-Appellant.*

No. 06-3288

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 05-00392—James S. Gwin, District Judge.

Argued: April 17, 2007

Decided and Filed: November 7, 2007

Before: MERRITT and GRIFFIN, Circuit Judges; LAWSON, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Edward G. Bryan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Kelly L. Galvin, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Edward G. Bryan, Vanessa F. Malone, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Kelly L. Galvin, Laura McMullen Ford, ASSISTANT UNITED STATES ATTORNEYS, Cleveland, Ohio, for Appellee.

　　MERRITT, J., delivered the opinion of the court, in which LAWSON, D. J., joined. GRIFFIN, J. (pp. 10-12), delivered a separate dissenting opinion.

_____

**OPINION**

_____

　　MERRITT, Circuit Judge. David Garner appeals his conviction after a jury trial for one count of carjacking pursuant to 18 U.S.C. § 2119(1) and one count of using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). Specifically, Garner contends that the district court erred in denying his motion for a new trial based on a violation of *Brady v. Maryland* arising from the government's failure timely to turn over cell phone records prior to trial. Alternatively, Garner

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

contends that the district court erred in denying his motion for a continuance to allow him time to investigate the information contained in the cell phone records.

This appeal raises a possible issue of mistaken identity. Defendant was convicted of carjacking based primarily on the testimony of (1) his codefendant, Bryce Smith, who, because he pled guilty and did not go to trial, had motivation to lie about both his role in the carjacking and the identity of his co-hijacker to minimize his role and possibly to exonerate his friend, Deandrew Foster, who may have been Smith's actual accomplice in the carjacking and (2) Shalonda Melton, the former girlfriend of codefendant Bryce Smith. Ms. Melton maintained a close relationship with Smith and had the motivation to lie both to help minimize the role of her ex-boyfriend, Bryce Smith, in the carjacking and to help their friend Deandrew Foster by implicating David Garner, whom she did not know, as the co-hijacker instead of Foster.

A cell phone belonging to the victim was in the truck at the time it was stolen and was used to make and receive calls by the hijacker or hijackers. Garner's counsel did not have timely access to the cell phone records that may well have impeached the testimony and credibility of Shalonda Melton and cast doubt on her identification of Garner as the co-hijacker. These records were in the government's possession for five days before they were turned over to Garner's counsel the morning the trial began. Recognizing the importance of the cell phone records to identify who was in the truck and using the stolen cell phone, Garner's counsel requested a continuance of trial to investigate further the outgoing and incoming calls on the stolen cell phone. The district court denied the motion for a continuance without giving adequate reasons for why a short continuance to allow Garner's counsel to investigate the cell phone records was unreasonable. The cell phone records provided strong evidence to support defendant's theory that he had been framed by Melton, Smith and Foster.

For the following reasons, we reverse the judgment of the district court and remand with instructions to conduct a new trial.

## I.

Defendant David Garner was charged along with Bryce Smith of a vehicle theft that occurred on May 10, 2005, in violation of 18 U.S.C. § 2119 and use of a firearm during a vehicle theft in violation of 18 U.S.C. § 924(c). Garner alone was also charged with vehicle theft in a separate incident that occurred on June 4, 2005. The two thefts were tried together in a jury trial that began on November 7, 2005. Garner was found not guilty of the June 4 theft, but the jury could not reach a verdict regarding the May 10 theft and the firearm charge. On November 9, during the first trial, Smith changed his plea to guilty. Retrial on the two remaining counts against Garner was set for November 21, 2005, 11 days after the end of the first trial. The facts that follow come from the testimony given at the second trial.

Shortly after midnight on May 10, 2005, Kareem Dotson of Cleveland, Ohio, was carjacked by two men in the driveway of the home of his girlfriend, Shalonda Melton. Dotson had arrived at Melton's home about 11 p.m. after she called him and asked him to come over after work. Dotson stayed only about an hour and then Melton accompanied him to the side door of her house and she watched him walk to his truck in the driveway. Before Dotson could unlock his truck, a masked man ran from the back of the house and hit Dotson on the head with a gun. The attacker forced Dotson to the ground at gunpoint and started to go through his pockets. The attacker took Dotson's cell phone and $10 cash.

Melton then noticed a second person on the back porch of the house who had his shirt pulled over his face. Melton testified that this person was also armed. Melton testified that she recognized the second individual as her former boyfriend, Bryce Smith. Smith then held a gun on Dotson while

the other attacker continued to rifle through Dotson's pockets. At this point, Melton's younger sister emerged from the house and started to yell "Stinker stop! Stinker stop!" She believed the initial attacker to be her ex-boyfriend, Deandrew Foster. Both Melton and her sister testified that they initially thought the other person was Foster because Smith and Foster are "always together." At this point, Melton testified that Smith said "I can't do this," and walked away.

Melton, thinking the other person was Foster, tried to take the truck keys away from him and told him to "quit playing." The person pulled his mask off and pointed the gun at Melton telling her that his name was "Pel Pel" not Foster. Melton testified that she was not acquainted with Pel Pel but only knew who he was because he was from the neighborhood. Several witnesses testified that defendant David Garner is known as "Pel Pel" in the community. Melton gave the assailant the truck keys and she testified that he drove away alone in Dotson's truck. The truck was not recovered until October 25, 2005, more than four months after the carjacking.

Melton went into her home and called 911 on her cell phone. The call was recorded. Melton told the 911 operator that her boyfriend had been "gunned down." She explained at trial that what she meant by this was that Dotson had been robbed at gun point. She initially told the operator that she did not know the carjacker's name, but her sister can be heard in the background saying "His name is Pel Pel" and Melton eventually told the operator that the carjacker's name was Pel Pel. She never identified or mentioned the name of Bryce Smith, her former boyfriend, or in anyway indicated that a second person had been involved.

The victim, Kareem Dotson, also testified. After being robbed, he ran down the street, away from Melton's house and called 911 from a friend's cell phone. He initially identified his attackers to both his friend and to the 911 operator as Smith and Foster. He believed the attackers to be Smith and Foster based on hearing Melton and her sister address the two attackers and his knowledge that Smith and Foster were always together. Although he testified that he heard the name "Pel Pel" during the carjacking, he did not give this name to the 911operator as one of his attackers. Dotson testified that he did not see the face of the first attacker because the attacker had something covering his face (J.A. at 150, 154-55), but that he did see the second attacker and identified him as Bryce Smith. Dotson testified that he "can't say for sure" that his first attacker was Garner. (J.A. at 156-57) Dotson did not change his story and identify the second attacker as "Pel Pel" until after he had spoken with Shalonda Melton later that night when she told him the attacker was "Pel Pel," not Deandrew Foster.

During the first trial, Bryce Smith pled guilty and he testified for the government at Garner's retrial. Smith testified that his mother and brother picked him up from work on the night of the attack and on the way home they passed Melton's house, which is in his neighborhood. He saw a truck with "nice-looking" rims in her driveway. Smith testified that he knew it was Dotson's truck because Melton had told him what kind of truck Dotson owned and he knew that Dotson and Melton were dating. He testified that he was still friends with Melton and that she had called him twice at work earlier that day and asked him to come over that evening.

Smith testified that after going home briefly, he went "cruising" in a nearby housing project. Smith said that although Foster was at his house when he arrived home, Foster did not accompany him. Smith also testified at trial that it was a weekend night, but in fact it was a Tuesday night. Smith testified that he encountered Garner at the projects, who was drunk and had a gun. He told Garner he had a "lick," which means he knew a way to make some money, usually by stealing. Garner agreed to accompany Smith. The two men then went to Melton's house and waited for the owner of the truck to leave, even though Smith testified that he did not know when, or even if, the truck's owner would emerge from Melton's house.

FBI Special Agent Douglas Williams testified at the second trial that on Wednesday, November 16, 2005, he received Dotson's cell phone records for May 9 and 10, 2005. The government had been trying for several months to obtain the records from Nextel and had issued three subpoenas before receiving the records. The records contained a list of incoming and outgoing phone calls for the hours immediately before and after the midnight carjacking. The records listed only the numbers, not the name of the subscribers to the numbers. Agent Williams began to call the numbers in an attempt to find out if subscribers to the numbers knew David Garner. He asked only about Garner; he did not ask the people he was able to contact if they knew Bryce Smith, Deandrew Foster, "Stinker" (Foster's nickname) or anyone else. (J.A. at 338-44)

The records were turned over to the defense at the start of the second trial on Monday, November 21, 2005, five days after the government received them. Garner's lawyer filed a motion *in limine* at the start of trial concerning the phone records on the ground of the late disclosure. He argued that if they had been provided earlier to him, he, like the government, could have learned the names of the people associated with the numbers and possibly learned relevant information about the identity of the person who stole the phone and used it that night. The district court tentatively denied the motion provided that the government disclose to the defense the names of any people identified as placing or receiving a call on the cell phone during the relevant time period.[1] In accord with the district court's directive, the government provided counsel with several names corresponding to numbers on the phone record and explained that it was unable to obtain names for the remaining numbers because the information was "too old to retrieve." One of the numbers on the record during the relevant time period was that of Shalonda Melton's cell phone, but her name was not one of the names identified to Garner's counsel before the start of the trial. The record does not reflect that Melton ever told anyone that she had called Dotson's cell phone and spoken with someone after the carjacking, leaving the phone record as the only evidence of this call.

The government introduced the phone records through Dotson so he could identify any numbers familiar to him. Garner's lawyer renewed his objection to admitting the records and also requested a continuance of trial to allow him time to research the phone numbers in the records. The objection was overruled and the motion for continuance denied. In denying the request for a continuance, the district court stated that the government had "provided in a timely fashion what they have. It's just . . . they didn't get it until late." J.A. at 160-61. The court told the defense that it could do whatever research it needed during the trial and that night and allowed the introduction into evidence of one page containing the relevant time period of the multi-page phone records.

The government introduced the phone records to show that Dotson's stolen cell phone had been used to call a Yolanda Gott. Ms. Gott was the roommate of Jennifer Love, a woman with whom Garner had an "intimate" relationship, as described by Ms. Love. Ms. Love did not have a cell phone and Garner sometimes called Gott's cell phone to reach Love, although Love testified that Garner also frequently called her land line phone or just stopped by her house without first calling. The call made to Ms. Gott's cell phone that night shows that the call lasted for 0 minutes, indicating the call did not connect. Love testified that in addition to knowing Garner, she also knew Bryce Smith. She testified that she did not know Deandrew Foster or anyone named "Stinker."

Dotson, who testified after Melton, then identified numbers in the records he knew, including a call from Melton's cell phone to Dotson's cell phone while it was in the possession of the person or persons who took the phone. The conversation lasted about three and one-half minutes. Because Dotson testified after Melton, defense counsel was unable to cross-examine Melton about the call and the record does not reflect to whom she spoke during those three and one-half minutes or about

---

[1]Dotson had the service to his cell phone turned off within a few hours of the carjacking.

the substance of the conversation.   As to the call to Yolanda Gott's phone, Dotson testified that he did not know Gotts or Love.

All testimony was concluded that day leaving only closing arguments for the next morning. During jury deliberations the jury asked for "the phone numbers of Shalonda Melton and Kareem's friend Greg who were called from Kareem's cell phone . . . , and any other phone numbers whose owner is known that was presented as evidence." J.A. at 363.  The court denied the request, telling the jury it "need[ed] to rely upon . . . its own recollection as to what the evidence was."   The jury entered a verdict of guilty on both counts and Garner appealed to this court.

## II.

Garner first argues that the government's failure to disclose the cell phone records in a timely manner constitutes a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), thereby requiring a new trial pursuant to Federal Rule of Civil Procedure 33 based on newly-discovered evidence.  A district court may grant a new trial pursuant to Rule 33 "if the interest of justice so requires."  Specifically, Garner contends that by failing to turn over the phone records before trial, he was denied the opportunity to put on a complete defense.  He was unable to contact subscribers listed on the record to ask if they knew Bryce Smith, Deandrew Foster, anyone named "Stinker" or any other relevant information.  The late disclosure of the records also prevented him from identifying Shalonda Melton's three and one-half minute phone call to the stolen cell phone, thereby denying him the opportunity to try to impeach Melton's testimony and question her credibility.

Pursuant to *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." 373 U.S. at 87.  Likewise, *Brady* also applies to the failure to disclose evidence affecting the credibility of a witness whose "reliability . . . may . . .  be determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150 (1972). *Brady* requires a showing that there is a "reasonable probability" that had the evidence been timely disclosed to the defense the outcome would have been different. *See United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006) (delay may violate *Brady* when the delay itself causes prejudice).  If previously undisclosed evidence is disclosed during trial, no *Brady* violation occurs "unless the defendant has been prejudiced by the delay in disclosure." *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986).

Courts consider undisclosed evidence material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992).

The cell phone records are material because the person or persons who attacked Kareem Dotson and took his truck also had his cell phone, which was taken from Dotson's pocket during the attack.  The cell phone was used to make and receive calls during the time it was out of Dotson's possession, presumably by the person or persons who attacked Dotson and took his truck.  The failure of the government to turn over the records within a time frame that would allow Garner's counsel to investigate them prejudiced defendant.  The government's characterization of the evidence of Garner's guilt as "overwhelming" is incorrect.

The identifications of Garner as the perpetrator by Dotson, Smith, Melton and Melton's sister are all subject to question.  Melton and her sister may have had personal motives to identify Garner, a stranger to them, instead of their friends and ex-boyfriends, Bryce Smith and Deandrew Foster. Melton also had inconsistencies and omissions in her stories, some of which are related below, that

call her credibility into question.  Smith, as a codefendant, may have been trying to minimize his role by placing most of the blame on Garner; in fact, asked Melton at one point not to identify him at all.  Dotson conceded at trial that he never saw the first attacker's face and relied primarily on what Melton told him after the carjacking about his attacker's identity.

Shalonda Melton's testimony was the primary evidence tying Garner to the crime, but when she first spoke with the 911 operator she said she did not know who the perpetrator was.  Later in the conversation she identified the perpetrator as "Pel Pel," but she never told the 911 operator about her friend Bryce Smith's involvement.  Melton concedes that when she saw Bryce Smith in her yard during the attack she presumed the other man was Deandrew Foster.  Kareem Dotson testified that he also thought his attackers were Bryce Smith and Deandrew Foster and those are the two names he gave to the 911 dispatcher when he called from a friend's house after the attack.  He also testified that he never saw his attacker's face.  His only knowledge that his attacker was Garner came from Melton, who told him later that night that the attacker was "Pel Pel" after he asked "Was it Stinker?"

Several other facts also demonstrate that the evidence against Garner is weak.  The government makes much of the fact that two phone calls were made from Dotson's cell phone to a Yolanda Gott after Dotson's attacker took his cell phone.  The calls are both recorded as outgoing at 1:43 a.m.: one of the calls never connected and the other lasted only .13 minutes, making it unlikely that anyone answered the phone.  Yolanda Gott's roommate, Jennifer Love, was a girlfriend of Garner's.  Love did not have a cell phone and Love testified that Garner would sometimes call her on Gott's phone.  On cross-examination, however, Love testified that she also knew Bryce Smith.

In addition, Agent Williams testified that the fingerprints on Dotson's truck when it was recovered did not match Garner's, but the government never compared the prints to Bryce Smith or Deandrew Foster.  Agent Williams testified that based on Shalonda Melton's testimony he believed that only Garner was in the truck when it was stolen and he could not justify investigating anyone else's involvement.  J.A. at 338-44.  Garner had been wanted by the police before the carjacking and, once he was identified by Melton as the attacker, it is clear that the police ceased investigating any other suspects or probing the witnesses' stories too deeply.

Due to the relative weakness of the identification of Garner and the government's heavy reliance on the testimony of Melton to convict Garner, Melton's credibility was paramount.  The importance of the denial of an opportunity to impeach this witness cannot be overstated.  Had Garner been able to impeach Melton's testimony by demonstrating that she made a three and one-half minute call to Dotson's cell phone after the carjacking, the verdict may have been different.  Melton testified that she never talked to Garner after the carjacking, yet the phone records demonstrate that she placed a three and one-half minute call to Dotson's phone after the carjacking, so she either talked to Garner or to someone else who had Dotson's phone.  She never mentioned this phone call in any of her recitations of the events of that evening.  Had Garner's counsel been given time to investigate the records, he may have been able to impeach Melton's credibility by demonstrating the discrepancy between her testimony and the evidence of the call in the phone records or perhaps even argued that the evidence was exculpatory by suggesting that it was Bryce Smith she was actually talking to that night and not Garner because Garner was never in the truck and was not involved in the carjacking.

The district court also found that because the prosecution did not get the records until just before trial they could not have been turned over earlier.  Although the prosecution may not have received the phone records until shortly before the start of trial, the records were in the possession of law enforcement investigators since the previous Wednesday, five days before the start of trial. This possession is imputed to the prosecution regardless of whether it had actual possession of the records.  The government used those five days to check the phone numbers to try to make

connections to Garner and concedes that it took "an extensive amount of time" to check the phone numbers in the records. The defense should have been afforded at least the same amount of time to conduct its own investigation, particularly because the FBI investigator concedes that he only asked about connections to David Garner – he did not ask any questions about connections to Bryce Smith, Deandrew Foster or any other individuals. J.A. at 158-61. When asked about this, he testified that he couldn't justify asking about anyone else because there was no evidence to support that it was anyone but Garner alone in the truck. J.A. at 338.

The government also points out that during his testimony, Kareem Dotson identified Shalonda Melton's cell phone number on the log. However, Dotson testified after Melton, so the only way to question Melton would be to request that the court recall her so Garner's counsel could ask about the call. However, Garner's counsel may have been reluctant to recall the government's key witness and ask crucial questions relating to his client's case without the ability to do his own investigation first. As he explained to the court, he should not be prejudiced by the government's violation of the discovery order for failure timely to turn over the records; he was entitled to conduct his own investigation into the records and should not be forced to rely solely on the government's one-sided investigation.

The government also states that Shalonda Melton's cell phone number had been revealed during the first trial so Garner's counsel should have recognized it in the phone records, despite the fact that it was buried on a log of multiple pages with many other numbers. The government also argued that Melton's number was in the record from the first trial and therefore should have been accessible to Garner's counsel during the second trial. However, Garner's counsel had not yet received the transcript from the first trial, despite putting in an expedited order with hopes of receiving it before the second trial. Given that the issue of the cell phone records was not present in the first trial and Garner's counsel had no other way of knowing at the time that Melton had spoken with the person who had Dotson's cell that night, he would have had no reason to record or recall Melton's cell phone number from the first trial.

By failing to turn over the records sooner, Garner did not receive a fair trial. Defendant's theory at trial was that Bryce Smith and Deandrew Foster committed the crime together and Garner was not involved in any way. The defense argued that Smith and Shalonda Melton, who had been romantically involved previously, lied about the events to protect Smith and Foster, who used to date Melton's sister. The defense also implied that Shalonda Melton may have set up Kareem Dotson to be robbed by calling Smith earlier in the day and telling him that Dotson would be at her house that evening and leaving around midnight. This theory has some support in that Melton talked to Smith by phone earlier in the day of the carjacking and apparently talked to Smith by phone after the carjacking as well, despite the fact that the two were no longer dating. She also called Dotson around 11 p.m. to invite him to her house only to tell him to leave an hour after he arrived.

That a reasonable probability existed that the outcome of the trial might have been different had Garner been able to investigate the cell phone records before trial is demonstrated by the fact that the jury sent out a question during deliberations asking about Shalonda Melton's cell phone number. This request shows that the jury recognized the importance of the cell phone records to Garner's guilt case. Had Garner's counsel had the information in a timely manner, Garner's defense could have been more complete and the credibility of Shalonda Melton, the key government witness, likely diminished.

### III.

Alternatively, even if the late disclosure of the cell phone records does not amount to a *Brady* violation, the denial of the request for a continuance to enable Garner's counsel to conduct the necessary investigation into the records was an abuse of discretion warranting a new trial. We

review denial of a motion for a continuance for abuse of discretion. *Ungar v. Sarafite,* 376 U.S. 575, 589 (1964)*; United States v. Crossley*, 224 F.3d 847, 854 (6th Cir. 2000). To demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense. Actual prejudice can be shown if the continuance "would have made relevant witnesses available *or added something to the defense.*"  *See, e.g., United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997) (emphasis added); *United States v. Frost,* 914 F.2d 756, 765 (6th Cir. 1990) (citing *United States v. Wirsing,* 719 F.2d 859, 866 (6th Cir. 1983)).

As the Supreme Court instructs, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 588-91. The question before the district court judge, and the question that now faces us, was whether admission of the cell phone records by the government without giving Garner adequate time to review the same records might have so affected the defensive ability of Garner's counsel as to necessitate a continuance to enable additional preparation and ensure a fair trial.  A reasonable time for adequate preparation of the accused's defense is the first essential of trial fairness, *Ungar*, 376 U.S. at 588-91; *United States v. Ploeger*, 428 F.2d 1204, 1205-06 (6th Cir. 1970), and "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Ungar*, 376 U.S. at 589.

At trial, the district court erroneously found that "defense counsel had adequate time to investigate each of the numbers . . .  and could have discovered that one of the numbers belonged to Melton through numerous sources," including web-based cell phone directories. FBI Agent Williams had the records for five days and was able to identify only some of the subscribers during that time; it is difficult to see how a defense lawyer with a trial starting immediately would have time properly to investigate the records without neglecting the trial. Garner's counsel did have an investigator start to look at the records right away, but one day was not enough time for the investigator to identify and call the numbers on the log.  In an argument that actually bolsters Garner's point in this regard, the government attorney countered that the reason the government did not know the subscribers to all the numbers was because the "subscriber information [is] too old to retrieve." She went on to explain how difficult it was for Agent Williams to obtain the information from the cell phone company and that is why the information was received so late.  If even the FBI could not get the subscriber information timely and easily, it is difficult to see why the trial judge ruled that Garner's attorney should be able to get the information within a day.

This ruling did not adequately consider the time pressures faced by counsel during a one-day trial:  we see no way Garner's counsel could have given his full attention to the trial and investigated the phone records at the same time. Furthermore, contrary to the district court's recommendation to Garner's counsel that he use a web-based cell phone directory, we know of no accurate web-based cell phone directories that are easily accessible to the public – the only way counsel could have adequately investigated the records was through old-fashioned foot work and calling of each of the numbers on the log.

Due to the importance of the phone records, Garner's counsel was entitled to time to investigate the records. A short continuance – perhaps only of a week – would have been adequate. Garner's counsel argues that had he had access to the phone records for the five days that Agent Williams had them without disclosing them, he would have investigated other potential connections between individuals listed on the phone records and Smith, Foster and Melton. For the same reasons discussed in more detail above, Garner was prejudiced by the failure to obtain a continuance to allow more time to fully investigate the cell phone records and put on a complete defense, including the possible impeachment of a key witness.

Here, we are left with the firm conviction that a continuance would not have been burdensome on the government or the trial court while it would have provided the defendant with an opportunity to prepare an adequate defense against the government's entire case against him –the arguably suspect testimony of Smith and Melton. The cell phone records could have been reviewed and an important defense theory possibly bolstered had a short continuance been granted. Under the circumstances it was an abuse of discretion not to do so.

## CONCLUSION

It is clear that the police investigation was conducted in a manner to support what the police believed – that David Garner was the primary attacker in this carjacking. This belief arose based almost solely on Shalonda Melton's identification of Garner as the attacker, despite her possible motive to protect two friends well known to her – her former boyfriend, Bryce Smith, and her sister's former boyfriend, Deandrew Foster. Given the initial uncertainty of the identity of the attacker by all the witnesses, combined with Melton's possible motivation to protect two friends at the expense of someone unknown to her, the opportunity to fully investigate the phone records may have provided counsel valuable evidence to exonerate his client or to at least raise a reasonable doubt as to his guilt.

For the foregoing reasons, the judgment of the district court is reversed and the case remanded for a new trial.

———————————

**DISSENT**

———————————

GRIFFIN, Circuit Judge, dissenting. I respectfully dissent.

Contrary to the majority's characterization, the evidence that defendant Garner was the carjacker was not "weak," but overwhelming. Specifically, the proofs included: (1) co-defendant Bryce Smith's testimony that he and Garner committed the carjacking; (2) Shalonda Melton's eyewitness identification of defendant as the carjacker; (3) Kareem Dotson's and Melton's testimony that the carjacker identified himself as "Pel Pel"; (4) the testimony of several witnesses that defendant is known commonly in the community as "Pel Pel"; and (5) the cell phone record that the carjacker called a roommate of Garner's girlfriend.

Also, the majority erroneously concludes that "[b]ecause Dotson testified after Melton, defense counsel was unable to cross-examine Melton about the call . . . ." Although Dotson testified after Melton, defense counsel was free to recall Melton to testify during defendant's case. *See e.g. United States v. Schnapp*, 322 F.3d 564, 572 (8th Cir. 2003), and *United States v. Orlando-Figueroa*, 229 F.3d 33, 46-47 (1st Cir. 2000). Defense counsel could have recalled Melton and made a motion to limit the scope of her testimony on recall, but chose to do neither. On appeal, Garner does not claim ineffective assistance of counsel.

My colleagues hold that a *Brady v. Maryland*, 376 U.S. 83 (1963), violation occurred because the police possessed the cell phone records for five days before they were given to defense counsel, and had they been timely disclosed, a "reasonable probability" existed that the jury would have rendered a different verdict.[1] I disagree with both conclusions. First, I view the disclosure within five days to be timely. On this issue, I agree with the ruling of the district judge:

> Dealing first with the issue of timeliness, the prosecution could have disclosed the phone records to defense counsel at a slightly earlier date. However, the delay was not egregious, as the government itself did not obtain the phone records until five days before the second trial. Moreover, the government maintains that it was unaware of any potential evidentiary value, let alone any exculpatory value, that the records may have held until the day before the trial was to commence. When it did determine that the records provided relevant evidence, the government provided copies of the phone log to the defense.

It is noteworthy that the majority cites no authority that a five-day delay in providing records under similar circumstances amounts to a *Brady* violation. *Cf. United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994) ("*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose."). "Delay only violates *Brady* when the delay itself causes prejudice." *Bencs*, 28 F.3d at 561 (quoting *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992), vacated and remanded on other grounds 113 S. Ct. 1378 (1993)).

———————————

[1]It is unclear whether the majority reviews the *Brady* issue de novo or for an abuse of discretion. *See United States v. Heriot*, 496 F.3d 601 (6th Cir. 2007), and the cases cited therein, on the conflicting standards of review. Under either standard, I would hold that the trial court did not commit error requiring reversal.

On the issue of prejudice, I also agree with the trial judge:

> Evidence is considered material only if there is a "reasonable probability that, had the evidence been disclosed to the defense," the outcome would have been different. *Zuern v. Tate*, 336 F.3d 478, 484 (6th Cir. 2003). The defendant is not necessarily required to show that the introduction of the evidence in question would have led to a different verdict. Rather, the appropriate inquiry is whether in the absence of the evidence the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In the instant case, the Court must answer this question in the affirmative.

Defense counsel, who was also trial counsel, has now possessed the cell phone records for over twenty-two months. However, no newly discovered evidence was cited to the trial court or to us on appeal that would affect the outcome of a new trial. Absent some showing of prejudice or evidence that the verdict was not worthy of confidence, no error requiring reversal occurred in the disclosure of the cell phone records. *Kyles*, 514 U.S. at 434.

Next, we review the denial of a motion for a continuance for an abuse of discretion. *United States v. Crossley*, 224 F.3d 847, 854 (6th Cir. 2000). As the Supreme Court stated in *Morris v. Slappy*, 461 U.S. 1, 11 (1982):

> Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances. . . .

Although I might have granted defendant's motion for a continuance, I cannot conclude that the trial judge abused his discretion in refusing to do so. At oral argument, defense counsel conceded that his investigator was available to assist him in evaluating the cell phone records. Thus, even if defense counsel was preoccupied in the trial of this case, his investigator was not and had over twenty-four hours to investigate the records. Before the conclusion of the trial, had defendant thought that the time to investigate the records was inadequate, a second motion for a continuance could have been filed. It was not.

Regarding the efforts of the defense investigator to track the persons to whom calls were made or received, the trial judge made the following findings:

> [D]efense counsel had adequate time to investigate each of the numbers that appeared on the record for the relevant time period, and could have discovered that one of those numbers belonged to Melton through numerous sources. For example, defense counsel could have interviewed witnesses about their possible knowledge of the numbers or consulted a web-based telephone directory. While Garner claims that Defense Investigator Gambetta conducted an investigation into the numbers for which the prosecution provided identification information, he gives no indication of the investigator's attempts to identify the holders of the remaining numbers. More importantly, Defendant Garner fails to show that the investigator was *unable*, or lacked the capability, to identify Melton's number.

Moreover, defense counsel was aware from Melton's testimony in the first trial that, on the night of the carjacking, she spoke to co-defendant Smith, who asked her not to press charges. A reasonable inference known to defense counsel, but never asked, is that the record of the call between Melton and Dotson's cell phone was this phone conversation between Melton and co-

defendant Smith.  If an uncertainty exists on this factual issue, it arises from defense counsel's strategic decision not to ask the question.

For these reasons, defendant has failed to sustain his burden of establishing that the trial judge abused his discretion in denying the motion for a continuance.  Moreover, absent a showing of prejudice, error, if any, in refusing to grant the motion is harmless error.  FED. R. CRIM. P. 52(a); *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006) (finding that district court did not abuse its discretion in denying motion for continuance where petitioner did "not demonstrate[] that he suffered prejudice as a result of the failure to grant the continuance"); *HC Gun & Knife Shows, Inc. v. City of Houston*, 201 F.3d 544, 550 (5th Cir. 2000) (noting that appellate court "will not substitute [its] judgment concerning the necessity of a continuance for that of the district court, unless the complaining party demonstrates that it was prejudiced by the denial") (internal quotations and citation omitted); *Ahern v. Scholz*, 85 F.3d 774, 792 (1st Cir. 1996) (holding that "even if" the district court abused its discretion in denying appellant's motion for a continuance, "the error was harmless"); *see also United States v. Tinson*, 23 F.3d 1010 (6th Cir. 1994) (holding that "any error in [district court's] granting the continuance was harmless").

I would affirm and respectfully dissent.  In my view, the reversal of defendant's convictions and remand for a new trial is an unwarranted futile exercise and a waste of valuable judicial resources.