NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0807n.06

**No. 15-3320**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MAURICE SNOW, | ) | **FILED** |
| | ) | Dec 10, 2015 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | **ON APPEAL FROM THE** |
| | ) | **UNITED STATES DISTRICT** |
| ERIK NELSON et al., | ) | **COURT FOR THE** |
| | ) | **SOUTHERN DISTRICT OF** |
| Defendants-Appellees. | ) | **OHIO** |
| | ) | |
| | ) | |

BEFORE:  GIBBONS and  McKEAGUE, Circuit Judges; ANDERSON, District Judge[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Maurice Snow appeals the district court's order granting summary judgment in favor of defendants Detective Erik Nelson and Officer Mark Rankin, on his 42 U.S.C. § 1983 claims. Snow alleges that defendants illegally arrested him and participated in his prosecution in violation of his Fourth and Fourteenth Amendment rights, based on Nelson's mistaken belief that Snow appeared in a surveillance video of a controlled drug purchase. For the reasons set forth in this opinion, we affirm the district court.

**I.**

In the summer of 2013, the Norwood, Ohio Police Department's Drug Task Force began an investigation into a man known as "Emmitt," who was later identified as Maurice Snow. Defendants Nelson and Rankin both participated in this investigation. The investigation began when Nelson received a tip from a confidential informant. The informant told Nelson that he had

---

[*]The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

previously lived with two people he knew only as Emmitt and Emmitt's girl, at 5613 Rolston Avenue in Norwood, Ohio, and that Emmitt was distributing illegal narcotics. He also told Nelson that he had served as an informant in other investigations with the Cincinnati Police Department and the Ohio Liquor Control Agency. Before investigating further, Nelson contacted Detective Howard Fox of the Cincinnati Police Department to discuss the informant's credibility. Fox told Nelson that the informant was reliable and recommended that Nelson use him.

On July 15, 2013, the Norwood Drug Task Force executed the first of four controlled drug buys from Emmitt. This purchase was videotaped from two separate locations, and it was recorded via a wire worn by the informant who purchased the drugs. The audio and video recordings of the July 15 controlled purchase reveal the following: The informant places a phone call to Emmitt and arranges to purchase crack cocaine. Before anyone arrives at the informant's location, he speaks into the wire. The informant says that "the subject is on the way . . . he is on the way to come to see me, and you will see him." Audio-Video File 89-13A, ECF No. 21. The informant is first approached by a thin, shirtless African-American man wearing white shorts. As the shirtless man approaches, the informant says "okay here he comes. This deal's gonna go down in about thirty seconds." Audio-Video File 89-13C, ECF No. 21. A few moments after the shirtless man arrives, another heavier-set African American man wearing a green shirt and a green plaid hat approaches. The man in the green shirt exchanges the money and crack cocaine with the informant.

The informant was debriefed shortly after the controlled buy. During the debrief, the informant told officers that "the little skinny guy" came over and spoke to him and then the heavier man in the green shirt arrived. Audio File 7/15/13, ECF No. 21. The informant identified the man in the green shirt as "the dope dealer," but he did not identify either person in the video

2

as Emmitt. *Id.* Following the debrief, Nelson prepared an Arrest Report and Trial Preparation Report noting that Emmitt personally appeared in the videos taken that day. In his deposition, Nelson testified that after the July 15 controlled buy and debrief he mistakenly assumed that the man in the green shirt was Emmitt. Likewise, Rankin testified that Nelson was at first mistaken that Emmitt was the man in the green shirt who appeared in the July 15, 2013 video, and that only later did they discover that Emmitt was using runners to conduct the drug purchases.

The day after the first controlled drug buy, Nelson obtained records showing that Maurice Snow and Tanisha Sims paid the utility bills at 5613 Rolston Avenue, the address where the informant said he previously lived with Emmitt and Emmitt's girlfriend. Nelson also obtained Ohio Bureau of Motor Vehicles ("BMV") photos of Snow and Sims, which he showed to the informant. The informant immediately identified Snow as Emmitt and Sims as Emmitt's girlfriend. He confirmed that these were the two people he lived with at 5613 Rolston Avenue and that Snow was the person he knew to be selling narcotics in Norwood under the name Emmitt. In his deposition, Snow confirmed that he lived at 5613 Rolston Avenue with his girlfriend, Tanisha Sims, from February 2013 through August 2013 and also that the BMV photo shown to the informant on July 16 was a photo of him.

The Drug Task Force subsequently used the informant to purchase drugs from Emmitt/Snow three more times, on July 16, July 30, and August 13. All four controlled buys started with a phone call from the informant to Emmitt, and all four resulted in actual drug purchases. Several different drug couriers are seen in the July 16, July 30, and August 13 controlled buys. During the August 13 purchase, the informant indicated that he saw Snow run down Rolston Avenue from his house to meet a drug courier outside of the Dale Road Drive Thru. The informant witnessed the drug courier hand Snow the $50.00 he had just used to

purchase the crack-cocaine, and he saw Snow walk back to his house at 5613 Rolston. Because of the location of the video cameras, none of this was captured on film.

On August 15, 2013, Nelson sent a memorandum to the Hamilton County Prosecutor's Office requesting that a grand jury consider indicting Snow on four counts of trafficking in narcotics. On August 21, 2013, Nelson was subpoenaed to testify before the grand jury, and on September 5, 2013, a grand jury indicted Snow on all four counts. Snow was subsequently arrested on October 18, 2013 and detained in the Hamilton County Justice Center.

Erik Laursen, Snow's counsel, served discovery requests on the State on November 12, 2013. The State responded on November 18, 2013 that police reports would be "[p]rovided with discovery as available" and that they would make "Surveillance Audio or Video" available for inspection. Laursen Aff. 503–04, ECF No. 32–1.

On December 9, 2013, Laursen appeared in court to discuss a "plea or trial setting." *Id.* at 497. Before this court session, Nelson showed Laursen the video of the July 15, 2013 controlled buy. At some point, Laursen asked Nelson to describe what was happening, and Nelson pointed to a man in the video and said, "There is your guy." *Id.* Nelson clarified that he thought Snow was the man in the green shirt who appeared in the July 15, 2013 video. At that point, Lieutenant Harry Schlie arrived. Laursen informed Schlie and Nelson that the man in the video was not Snow. Schlie and Laursen then went to the holding area where Snow was, and Schlie confirmed that Snow was not the man in the video. Laursen returned to the courtroom, where he moved for and was granted a recognizance bond. The State dismissed its case shortly thereafter.

Snow subsequently filed a complaint pursuant to 42 U.S.C. § 1983, alleging deprivations of his rights under the Fourth and Fourteenth Amendments. The district court granted defendants-appellees' motion for summary judgment, and this timely appeal followed.

## II.

We review a district court's decision to grant summary judgment *de novo*. *Miller v. Sanilac Cty.*, 606 F.3d 240, 246 (6th Cir. 2010). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Moldowan v. City of Warren*, 578 F.3d 351, 373–74 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). We view all facts and inferences in the light most favorable to the nonmoving party and uphold a grant of summary judgment "only where the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Miller*, 606 F.3d at 247.

"At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact." *Moldowan*, 578 F.3d at 374 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, however, the moving party may meet its burden by showing "'that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325). When the moving party has carried this burden, the nonmoving party may not rest upon its allegations and denials, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.

### A.    Fourteenth Amendment *Brady* Claim

Snow first claims that Nelson and Rankin violated the Fourteenth Amendment by failing to disclose to prosecutors and the grand jury that on July 15, 2013, the confidential informant identified a man who was not Snow as "the dope dealer," but on the following day identified

Snow as "Emmitt," the suspected drug dealer and target of the investigation. While there is some argument about whether Snow raises his *Brady* claim for the first time on appeal, assuming that this claim is properly before us, it lacks merit because the alleged exculpatory evidence was disclosed, and Snow never stood trial.

Defendants first argue that Snow's *Brady* claim is not properly before this court because it does not appear on the face of his complaint. As a general rule, this court does not consider new arguments presented for the first time on appeal. *See, e.g.*, *United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006). Moreover, we have held that "[t]he appropriate method for adding new factual allegations to a complaint is not via an appellate brief, but by filing an amended complaint." *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 328 (6th Cir. 2006). Defendants are correct that Snow's complaint does not allege a *Brady* violation. It does allege a deprivation of his rights under the Fourth and Fourteenth Amendments, but it only states a single cause of action, which nearly mirrors the elements of a Fourth Amendment malicious prosecution claim. Notably absent is any mention of *Brady* or the elements of a *Brady* claim. However, Snow's *Brady* and malicious prosecution claims are premised on the same underlying facts. *See Gregory v. City of Louisville*, 444 F.3d 725, 750–51 (6th Cir. 2006) (noting that *Brady* and malicious prosecution claims can share a factual premise and that plaintiffs are free to pursue claims under both theories). The factual premise of Snow's *Brady* claim appears on the face of his complaint and, thus, Snow's appeal does not seek to augment the factual allegations of his complaint. What is more, Snow's *Brady* claim was raised in his Response in Opposition to Defendants' Motion for Summary Judgment, and it was briefed by both parties before the district court. We assume, therefore, that Snow's *Brady* claim is properly before us. However, we find the merits of that claim lacking.

When exculpatory material is disclosed, even belatedly, there is generally no *Brady* violation. *See United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986), *cert. denied*, 480 U.S. 922 (1987) ("In general, the principles announced in *Brady* do not apply to a tardy disclosure of exculpatory information, but to a complete failure to disclose."). If a criminal defendant can show that he was materially prejudiced by a delay in disclosure, it may be grounds for a *Brady* claim. *Id*. However, when exculpatory information is disclosed "'in time for use at trial'" there is no constitutional violation. *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004) (quoting *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988)). This follows logically from our understanding that material prejudice occurs only when it is likely that the disclosure of the evidence would have altered the *result* of the proceeding. *See United States v. Garner*, 507 F.3d 399, 405 (6th Cir. 2007). Here, the information was disclosed before a trial date was set. And immediately after Snow's attorney first learned of the alleged misidentification, his client was released, and the charges were dropped.

Despite never standing trial and ultimately being released, Snow maintains that he has stated a proper *Brady* claim because the alleged failure to disclose resulted in his detention for fifty-two days. This argument, however, misperceives the harm *Brady* claims are designed to redress. *Brady*'s "ultimate concern [is] ensuring that criminal defendants receive a fundamentally fair trial." *Moldowan*, 578 F.3d at 378 (internal quotation marks omitted). In light of this concern, we have held that liability for a *Brady* violation only exists when evidence sufficient to "'put the whole case in such a different light as to undermine confidence in the *verdict*'" is improperly withheld. *Johnson v. Mitchell*, 585 F.3d 923, 933 (6th Cir. 2009) (quoting *Kyles v. Whitley,* 514 U.S. 419, 435 (1995)) (emphasis added). Furthermore, a *Brady* claim requires "a

showing that there is a 'reasonable probability' that had the evidence been timely disclosed to the defense the *outcome* would have been different." *Garner*, 507 F.3d at 405 (emphasis added).

Here, the State did not secure a criminal conviction by improperly withholding exculpatory evidence. On the contrary, the record is clear that the State was complying with discovery requests. Moreover, there is no question that before a plea was discussed or trial dates set, Snow's attorney learned of the allegedly exculpatory information. Perhaps Snow would have been released earlier had the alleged misidentification come to light sooner, but he can have no complaints about the ultimate *outcome* of his case. The fifty-two days Snow spent in jail awaiting a plea or a trial is simply not the type of deprivation *Brady* claims are intended to remedy.

Even were we to recognize a *Brady* claim in this context, defendants would be entitled to qualified immunity. As we held in *Robertson v. Lucas*, our precedent does not support any clearly established right of criminal defendants to receive exculpatory *Brady* material before plea bargaining. 753 F.3d 606, 621 (6th Cir. 2014). There, the court found that while every reasonable officer "would know that they were under an obligation to present *Brady* material to the prosecutors in time for its effective use at trial," the officers were under "no clearly established obligation to disclose exculpatory *Brady* material to the prosecutors in time to be put to effective use in plea bargaining." *Id.* at 621–22 (internal quotation marks and citations omitted.) Here, Snow's attorney was aware of the alleged misidentification prior to any plea bargaining. Thus, defendants are well within the ambit of qualified immunity.

## B. Fourth Amendment Malicious Prosecution Claim

Snow also claims that he was subject to malicious prosecution in violation of the Fourth Amendment. To successfully prove a § 1983 malicious prosecution claim premised on a Fourth

Amendment violation, Snow must show the following: (1) a criminal prosecution was initiated against him and that defendants made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, he suffered a deprivation of liberty apart from the initial seizure; (4) and the criminal proceeding was resolved in his favor. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). Because Snow's malicious prosecution claim is clearly and easily resolved by addressing the second prong of his claim, it is unnecessary to analyze the remaining elements.[1]

It is well-settled that the "finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (citing *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)). However, we recognize an exception to this general rule when defendants deliberately or recklessly present false testimony to a grand jury in order to obtain an indictment. *See Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015); *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014). Snow's burden at summary judgment, therefore, was to adduce evidence that defendants knowingly or recklessly presented false testimony to the grand jury. This he has not done.

The record is unclear as to which officer testified before the grand jury, and because the record does not contain a transcript of the grand jury proceedings, there is no way to answer this question with certainty. In his deposition, Nelson stated that he, Officer Rankin, and Officer Schlie took turns testifying before grand juries, and that he could not remember who testified in

---

[1] It should be said, however, that in this case the first prong inquiry largely mirrors the second prong analysis. Snow premises appellees' liability on their testimony before the grand jury. Therefore, to establish their involvement in commencing a criminal proceeding Snow was required "to present evidence that [the officers] (1) stated a deliberate falsehood or showed reckless disregard for the truth [at the hearing] and (2) that the allegedly false or omitted information was material to the [grand jury's] finding of probable cause." *Sykes*, 625 F.3d at 312 (internal quotation marks and citations omitted). Because the grand jury transcript is not in the record, Snow cannot make the required showing.

Snow's case. The district court presumed that because Nelson was the one subpoenaed to appear before the grand jury, he was the one who testified. But even assuming Nelson testified, without a transcript of the proceedings, we cannot discern the content of the presumed testimony, much less whether it was deliberately or recklessly false. [2]

Snow argues that a reasonable jury could infer that Nelson's testimony before the grand jury implicated Snow and failed to disclose the informant's alleged misidentification of the target of the investigation. While we must draw all reasonable inferences in the light most favorable to the nonmoving party, there must be some evidentiary basis from which to infer. *See Webb*, 789 F.3d at 661 ("To make out a genuine issue of material fact, [a] plaintiff must present significant probative evidence tending to support [his] version of the facts, evidence on which a reasonable jury could return a verdict for [him]." (internal quotation marks and citation omitted)). Without a transcript of the grand jury proceedings, there is no evidence that defendant-appellees testified falsely or recklessly and, therefore, no evidence that undermines the presumption of probable cause created by the indictment. *See Young v. Owens*, 577 F. App'x. 410, 416–17 (6th Cir. 2014) (affirming grant of summary judgment on malicious prosecution claim where plaintiffs alleged officers testified falsely before the grand jury but where grand jury transcript was not part of the record). Snow has failed his burden to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

Even were we inclined to make the inferential leaps Snow asks us to, his malicious prosecution claim still fails because probable cause existed to arrest him, notwithstanding the allegedly false testimony. To determine whether there was probable cause to indict Snow, this court must analyze the totality of the circumstances to see whether facts and circumstances were

---

[2] At the district court, Snow did not attempt to show by affidavit or declaration that he was unable to obtain a copy of the grand jury transcript, nor does he argue anything of the kind on appeal. *See* Fed. R. Civ. P. 56(d)(1)–(3).

sufficient to lead a reasonable person to believe that Snow committed the particular offenses with which he was charged. *See McKinley v. City of Mansfield*, 404 F.3d 418, 445 (6th Cir. 2005). The first step in this analysis is to "set aside the [false] statements and include the information omitted" to determine whether the indictment is still supported by probable cause. *Sykes*, 625 F.3d at 305. Thus, we must hypothesize a grand jury that did not think Snow appeared in any of the videos and was aware of the informant's alleged misidentification. Even in light of these assumptions, there are other relevant facts in the record to support a finding of probable cause.

The confidential informant was known to be reliable, and he had firsthand knowledge of Snow. *See Webb*, 789 F.3d at 663 ("Information from a confidential informant who has been established as reliable can serve as the basis for probable cause.") (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Throughout the investigation, the only person the informant ever positively identified as Emmitt was Snow, and he also immediately identified Tanisha Sims, Snow's girlfriend at the time, as Emmitt's girlfriend. Moreover, the police independently corroborated that Snow and his girlfriend lived at 5613 Rolston Avenue. *See Gates*, 462 U.S. at 241 ("Our decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work."). Even if we make the strained assumption that the informant's identification of another individual as "the dope dealer" has some exculpatory value, based on the other evidence of the informant's veracity, the alleged misidentification does not approach conclusive proof that the informant was unreliable. *See id.* at 232.

Additionally, other circumstantial evidence provides support for probable cause in this case. For example, the informant placed four calls to the person he knew as Emmitt to arrange to purchase crack-cocaine and all four calls resulted in drug purchases. Although Snow does not

appear in the July 15 video, use of a runner is consistent with Emmitt's practices, as shown by the July 16, July 30, and August 13 drug purchases. Finally, during the August 13 controlled drug buy, the informant, who had personal knowledge of Snow, witnessed Snow take money from a drug courier and walk back to his house at 5613 Rolston Avenue.

Snow maintains that his release almost immediately following the discovery of Nelson's mistake is conclusive evidence that no probable cause existed to arrest and prosecute him. However, "[a]n arrest grounded in probable cause does not become invalid merely because the State chooses not to prosecute the individual." *Williams v. Cambridge Bd. Educ.*, 370 F.3d 630, 638 (6th Cir. 2004). Based on the totality of the circumstances and ignoring the allegedly false testimony and material omissions, there was probable cause underlying the grand jury's indictment, and therefore, Snow cannot show that he was subjected to malicious prosecution in violation of his Fourth Amendment rights.

## IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment for defendants.