NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0279n.06

**Nos. 08-3102, 08-3490**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**May 11, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| PAUL MONEA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |
| | ) | |

Before:  SUTTON, KETHLEDGE, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**  After a jury convicted him of three counts of money laundering and one count of conspiracy to commit money laundering, defendant-appellant Paul Monea ("Monea") was sentenced to 150 months in prison.  He appeals his conviction and the district court order denying his motion for acquittal/new trial.   We **AFFIRM**.

## I.  FACTS AND PROCEDURAL HISTORY

Beginning in 2004, the FBI conducted an undercover money-laundering investigation focusing on Michael Miller, the owner of auto-sales businesses around Canton, Ohio.  Undercover FBI agent John Tanza posed as "John Rizzo," a drug-deal broker with significant amounts of money he needed to make appear legitimate.[1]  Miller introduced Monea to Rizzo in March 2006.

On March 30, 2006, after spending some time with Rizzo, Monea asked him if he would be

---

[1]Because Agent Tanza is generally referred to as "Rizzo" in the testimony and recordings, we refer to him as Rizzo as well.

interested in investing in a business venture – a voyeur website called "Tyson's House Party," which would record the activities of women living at a house Monea owned that was once the estate of boxer Mike Tyson. That same day, Miller, Rizzo, and Monea had lunch together and toured the Tyson estate. Over lunch, Rizzo told Monea that he had a lot of money that he needed to move into "legitimate" businesses. After they returned from the tour, Monea asked Rizzo if he was interested in investing in the project. Monea stated he was looking for around $300,000, and Rizzo asked Monea if he had a problem taking cash. Monea responded he was reluctant because he was "probably under a microscope with the feds right now." In the conversation, Rizzo emphasized his need to invest cash:

Rizzo: But my problem is . . . I can't have anybody looking because . . .

Monea: You don't even have to go there.

Rizzo: Okay.

Monea: I mean I understand. I've dealt in cash before.

During the same conversation, Monea and Rizzo had the following exchange:

Monea: Let me ask you another question. You're looking for things that you can put cash money into.

Rizzo: Uh-hmm.

Monea: That I don't want to use the word legitimize. What's the word I'm looking for.

Rizzo: I . . . I don't like that word.

Monea: That gives you . . . that gives you uh . . . interests in legitimate businesses that you can generate a cash flow from so that you have a return on your capital.

Rizzo: That and I . . .

Monea:      That you're unable to get with cash.

Rizzo:      Right. And that could buy things. I can't go to a bank and get a mortgage. I can't . . . do . . . like buy a house.

Monea:      Anything.

Rizzo:      So I need to see . . . it needs to be a . . . um . . . return that I can walk into[,] I pay taxes this year probably for the first time in a while because I had an income.

Monea:      Okay. I understand what you're tryin' to do. Now let me ask ya a question. If you don't wanna answer, don't. Uh . . . quantify that amount of money that you're trying to put into things that can generate long term income from you from real businesses. Just give me a range.

Also in the course of this conversation, Monea told Rizzo that he had a friend who ran West Coast Customs, a car detailing and remodeling company in California. Monea explained that the owner was a friend he could trust with his life, and that he was thinking "about how I can use him." The men discussed how the business dealt in a lot of cash. After Monea learned Rizzo was willing to put a "[a] couple million" dollars into "real businesses," he told Rizzo he would put his "thinking cap" on. The two men exchanged contact information and agreed to get in touch the next day.

Later, Monea and Rizzo arranged to meet in California for Monea to show Rizzo West Coast Customs. When they met at West Coast Customs in May 2006, Monea asked Rizzo if he still wanted to talk about going into business. Monea inquired briefly if Rizzo had any interest in the "Tyson's House Party" project. Though nothing came of that project, the two men spoke in more detail about possibly laundering money through West Coast Customs. Rizzo reminded Monea that Monea was going to talk to the West Coast Customs owner about whether the owner could "take the cash through the business." Monea stated that he thought that the owner would be interested in

Rizzo "parking . . . money in West Coast Customs" because the owner did not have the "cash flow that he needs" and "could use money right now." The men discussed Rizzo potentially giving cash to the West Coast Customs owner, who could then issue business checks to Rizzo as an employee or consultant of the business.

Also during this conversation, Rizzo explained that his bosses were drug dealers:

Rizzo: Well to be honest with you, to be frank with you, the guys I know from South America are huge drug dealers. They're huge drug dealers.

Monea: Yeah, I don't see any problem with them coming here, buying a car and then paying cash for it . . .

Rizzo: Right.

Monea: And taking it back to South America or Miami, or wherever they are.

Rizzo: They have it shipped.

Monea: I don't see that as a problem. I used to build boats in Miami and I sold half a dozen off-shore power boats to drug dealers for cash.

Rizzo: Okay.

Monea: And they would come in with a bag of cash. You don't count the money because you insult them.

During that same meeting, Rizzo explained that he was a cocaine "broker" who dealt in large amounts of cocaine. Monea offered to show Rizzo a picture of a large diamond that belonged to him.[2] Monea explained that he was in the process of retrieving it so that he could sell it. At some point, Monea showed Rizzo the diamond.

---

[2]The diamond is a 43-carat flawless yellow diamond known as "The Golden Eye." Although Monea referred to the diamond as "my stone," technically the owner of the stone was the Monea Family Trust.

In October 2006, Monea and Rizzo had lunch. They talked about Monea's efforts to sell the diamond, and Rizzo mentioned that he had a "guy down South" who might want to buy it. Monea expressed apprehension about accepting cash, and suggested that wiring payment would be better. They agreed that Rizzo would check with his potential buyer, and then meet Monea in Las Vegas, where Monea would show the potential buyer the diamond and discuss a sale. Rizzo met Monea in Las Vegas on October 31, 2006. In another recorded conversation, Monea and Rizzo discussed the possibility of the buyer purchasing both the Tyson estate and the diamond in exchange for a monetary payment and a boat. They were to meet with the drug dealer's representative the next day; the actual purchaser would not be entering the United States. They discussed the best way to conduct the transaction, the problem of receiving cash, Monea's conversations with his attorney about his responsibilities concerning knowledge of the money's source, and whether Monea could use the IOLTA account of the attorney representing the Monea Family Trust in the transaction.

On November 2, 2006, Monea and Rizzo met with an undercover FBI agent posing as "Geraldo," the buyer's representative. On the way to the meeting, Rizzo again explicitly mentioned, and Monea confirmed, that they were dealing with drug dealers. At the meeting, Monea and "Geraldo" negotiated and agreed that "Geraldo" would purchase the diamond and the Tyson estate for $19.5 million and a boat. Monea explained that the money would go to his trust, and that a deposit should be wired to his attorney's escrow account.

Monea and Rizzo had several conversations over the next few days concerning the details of wiring the deposit. By the end of November, $100,000 had been wired, in three installments, to Monea's attorney's IOLTA account. The transaction was to close at a December 13, 2006, meeting at Monea's attorney's office, contingent on a gemologist confirming that the diamond was genuine.

After the diamond was authenticated, Rizzo purported to make a call to wire the remaining payment. In reality, he alerted FBI agents, who entered the office and arrested Monea, Rizzo, and Miller.

The indictment, returned January 9, 2007, charged Monea (and co-defendant Miller) with one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h) and three substantive counts of money laundering in violation of 18 U.S.C. § 1956(a)(3)(B). Trial was originally set for March 19, 2007, but was postponed after the issuance of a superceding indictment stating new charges against Miller. Trial took place from May 14 to May 22, and the jury found Monea guilty of all four counts.[3]

On June 4, 2007, Monea filed a motion for acquittal and/or new trial. The court held a hearing on the motion on October 15, 2007, and a sentencing hearing on December 7, 2007. Monea was sentenced to 150 months in prison, and immediately appealed on December 14, 2007. The district court entered judgment on January 18, 2008. On March 17, 2008, the district court denied the motion for acquittal/new trial. Monea filed an amended notice of appeal on March 24, 2008.[4]

## II. ANALYSIS

Monea challenges his conviction and sentence on several grounds.

## A. Sufficiency of the Evidence

---

[3]The jury also forfeited Monea's interest in the diamond, real estate, and money.

[4]This appeal is properly before the court. It appears that Monea filed his initial notice of appeal prematurely as the district court had not yet issued its judgment. Although Monea failed to file an amended notice of appeal within ten days post-judgment as required by the version of Fed. R. App. P. 4(b)(1)(A) in place at the time, Monea's motion for acquittal or new trial (filed pursuant to Fed. R. Crim. P. 29 and 33) was pending at the time of the district court's judgment. Under the previous version of Rule 4(b)(3)(A), such a motion tolled the time in which an appellant must file his notice of appeal until ten days after entry of the order disposing of the motion for acquittal or new trial. Because Monea filed his amended notice of appeal within ten days after his motion for acquittal or new trial was denied, his appeal is timely. We have jurisdiction to consider the appeal pursuant to 28 U.S.C. § 1291.

## 1. The Relevant Provisions[5]

In evaluating the sufficiency of the evidence, we inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The conspiracy provision, 18 U.S.C. § 1956(h), states that anyone who conspires to commit one of the substantive offenses described in the statute is subject to the same penalty that applies to the substantive offense. In this case, Monea was convicted of conspiracy to commit money laundering as defined by 18 U.S.C. § 1956(a)(1)(B)(i). The relevant statutory provisions state:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
> (B) knowing that the transaction is designed in whole or in part--
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

---

[5] The indictment lists four counts: one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and 18 U.S.C. §§ 1956 (a)(1)(A)(i), (a)(1)(B)(i) & (a)(1)(B)(ii), and three counts of substantive concealment money laundering in violation of 18 U.S.C. § 1956 (a)(3)(B). However, not all three of the possible underlying bases for the § 1956(h) conspiracy charge are at issue on appeal. The jury was not instructed on § 1956 (a)(1)(A)(i), the "promotion" laundering provision. And, on appeal, the parties appear to agree that Monea's conspiracy conviction was based on the underlying § (a)(1)(B)(i) "concealment" charge, and not the § (a)(1)(B)(ii) "reporting" charge, as both only argue the elements of § (a)(1)(B)(i). Since any one of the three provisions can form the basis for a conspiracy conviction under § 1956(h), and we conclude that there was sufficient evidence of concealment money laundering under § (a)(1)(B)(i), we will confine our discussion of the underlying basis for the § 1956(h) conspiracy charge to § (a)(1)(B)(i). Thus, for the purposes of this appeal, the relevant statutory provisions are 18 U.S.C. §§ 1956(h), (a)(1)(B)(i), & (a)(3)(B).

18 U.S.C. § 1956(a)(1)(B)(i). In addition, Monea was convicted of three counts of substantive money laundering in violation of 18 U.S.C. § 1956(a)(3)(B):

> (3) Whoever, with the intent--

> (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity;

> conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

There are some important differences in the elements of § (a)(1) and § (a)(3). Section (a)(1)(B)(i) describes "concealment" money laundering and requires that the transaction or attempted transaction in fact involve illegal proceeds. In contrast, § (a)(3), known as the "sting" provision, applies where it is represented to the defendant that the property is a proceed of unlawful activity, although in reality it is not. *See United States v. Magluta*, 418 F.3d 1166, 1176 (11th Cir. 2005). *Compare* 18 U.S.C. § 1956(a)(1) ("conducts or attempts to conduct such a financial transaction *which in fact* involves the proceeds of specified unlawful activity") (emphasis added), *with* 18 U.S.C. § 1956(a)(3) ("conducts or attempts to conduct a financial transaction involving property *represented to be* the proceeds of specified unlawful activity") (emphasis added). Regarding mens rea, under § (a)(1)(B)(i), the government need only establish that the defendant knew that the transaction was designed in whole or in part to conceal the nature or source of the funds, or to avoid a reporting requirement. In contrast, § (a)(3) requires a showing that the defendant himself had the intent to conceal or disguise the nature, source, etc., of the funds. *See* 18 U.S.C. § 1956(a)(3)(B).

### 2. § (a)(1)(B)(i)

As to the § (a)(1) conspiracy claim, Monea contends that he did not know that the transactions were "designed" to conceal the source of the funds. He argues that in *Cuellar v. United*

*States*, 553 U.S. 550 (2008), the Supreme Court clarified that "designed" to conceal means a "purpose" to conceal, and that the diamond sale did not have concealment as its purpose.

In *Cuellar*, the defendant was stopped while driving south near the Mexican border with $81,000 in cash, bundled in plastic bags and duct tape, hidden in a secret compartment under the vehicle's rear floorboard, which was covered with animal hair. The Fifth Circuit, sitting en banc, affirmed Cuellar's conviction of "transportation" money laundering under 18 U.S.C. § 1956(a)(2)(B)(i),[6] concluding that Cuellar's extensive efforts to prevent detection of the money during transportation were sufficient to meet the statute's requirement that he know that the transaction was designed to "conceal or disguise the nature, location, and source, ownership, or control of the funds." *Cuellar*, 128 S. Ct. at 1999. The Fifth Circuit understood "design" to refer not to the purpose of the transportation, but to the manner in which it was carried out. *Id*. at 2003. The Supreme Court reversed, holding that under the statute, "when an act is 'designed to' do something, the most natural reading is that it has something as its purpose." *Id*. The court found that

---

[6]The relevant subsection of (a)(2) provides,

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States –

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer *is designed* in whole or in part –

(i) *to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity*;
 . . .

shall be sentenced to a fine of not more than $500,000 . . .

18 U.S.C. § 1956(a)(2)(B)(i) (emphasis added).

under the Fifth Circuit's interpretation, the statute would apply whenever a person transports illicit funds in a sufficiently secretive way – a result not intended by Congress. *Id.* at 2004. The Court acknowledged that the same secretive aspects of the transportation could also serve as circumstantial evidence that the transportation itself was intended to conceal or disguise the nature, location, source, ownership, or control of the funds. *Id*. at 2004. But, it emphasized that that secrecy had to be *the purpose* of the transportation. *Id*. at 2004-05. In other words, the government "had to prove, not simply that the transportation of the funds from the United States to Mexico would have had one of these effects," *i.e.*, to make it harder to ascertain that the funds were drug proceeds, to determine where they came from, to find out who controlled them, etc., "but that petitioner *knew* that achieving one of these effects was a *design* (*i.e.*, purpose) of the transportation." *Id*. at 2006 (Alito, J., concurring). The Court concluded that the government's evidence fell short of this standard, and overturned Cuellar's conviction.

Although Monea was not convicted of § (a)(2)(B)(i), transportation money laundering, the provision at issue in *Cuellar*, the relevant "design" language in § (a)(1)(B)(i), concealment money laundering, is identical to the "design" language in § (a)(2)(B)(i). Thus, the *Cuellar* holding has been applied to § (a)(1)(B)(i) convictions as well. *See United States v. Cedeño-Pérez*, 579 F.3d 54, 61 (1st Cir. 2009); *United States v. Brown*, 553 F.3d 768, 787 n.56 (5th Cir. 2008).

Incorporating *Cuellar*'s holding, then, money-laundering convictions under § 1956(a)(1)(B)(i) require proof of the defendant's knowledge of two separate facts: first, that the funds involved in the transaction are the proceeds of illegal activity, and second, that *a purpose* of the transaction is to conceal the nature of the proceeds. *See United States v. Campbell*, 977 F.2d 854, 857 (4th Cir. 1992), *cert. denied*, 507 U.S. 938 (1993). Monea's contention that he did not design the sale of the diamond and house with the purpose of concealing the location, ownership, or control

of the funds used to purchase them challenges only the second requirement.[7] The central problem

with this argument as a defense to a § (a)(1)(B)(i) charge is that the government need not prove that

Monea himself acted with the purpose of concealment. Under § 1956(a)(1)(B)(i), it is sufficient that

Monea had knowledge of Rizzo's purpose.

The Fourth Circuit explained the point in a case with somewhat analogous facts. In *United*

*States v. Campbell*, 977 F.2d at 855, a drug dealer sought out the defendant real estate agent in order

to purchase a house. The buyer exhibited clear signs of being involved in some sort of illegal

business, *see id.* at 855-56, although there was no evidence that Campbell had the purpose of

concealing the proceeds of illegal activity. In reversing the district court's judgment of acquittal, the

Fourth Circuit explained the mens rea required to convict of § 1956(a)(1)(B)(i),

> This distinction is critical in cases such as the present one, in which the defendant is
> a person other than the individual who is the source of the tainted money. It is clear
> from the record that Campbell herself did not act with the purpose of concealing drug
> proceeds. *Her motive, without question, was to close the real estate deal and collect
> the resulting commission, without regard to the source of the money or the effect of
> the transaction in concealing a portion of the purchase price. However, Campbell's
> motivations are irrelevant. Under the terms of the statute, the relevant question is
> not Campbell's purpose, but rather her knowledge of [the drug-dealer buyer's]
> purpose.*

*Id.* at 857-58 (emphasis added). *Accord United States v. Martinez-Medina*, 279 F.3d 105, 115 (1st

Cir. 2002) ("Where the defendant is someone other than the source of the illegal proceeds . . . the

statute is concerned with his knowledge of the source's intent in the transaction."); *United States v.*

*Rahseparian*, 231 F.3d 1257, 1264 (10th Cir. 2000) (if "the defendant is not the source of the illegal

funds," the relevant inquiry is "whether he knew of an intent to conceal"); *United States v. Hughes*,

---

[7]Although Monea initially phrases his claim with respect to the conspiracy count as an assertion that neither he nor Miller knew that the financial transactions were designed to conceal the source of the funds, his actual argument is that neither he nor Miller designed the sale of the diamond and house to conceal the location, ownership or control of the funds used to purchase them.

102 F.3d 550 at *9 (5th Cir. 1996) (unpublished) (the "government need only prove that [defendants] were aware of [non-defendant drug dealers'] intention to conceal or disguise the nature of the money, not that [defendants] themselves so intended"); *United States v. Wynn*, 61 F.3d 921, 924 (D.C. Cir. 1995) ("The language of the statute requires only that [spenders of illegal proceeds]--not [defendant store owner]--be motivated by a desire to conceal."); *United States v. Carr*, 25 F.3d 1194, 1206 (3d Cir. 1994) (allowing conviction "not only where the defendant has personally designed the transaction with intent to disguise the funds, but also where the defendant knows someone else designed the transaction intending to disguise the funds"); *United States v. Hussein*, 986 F.2d 1425 at *4 (7th Cir. 1993) (unpublished) (evidence sufficient where defendant had knowledge of non-defendant drug dealer's intent to conceal). *But cf. United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) (overturning § 1956(a)(1)(B)(i) conviction because no evidence of defendant's purpose to conceal without examining whether defendant had knowledge of others' purpose in structuring the transactions).

The relevant inquiry, then, is whether Monea and his co-conspirator Miller knew that Rizzo designed the transaction to conceal the nature of the proceeds. There was substantial evidence from which a rational juror could find beyond a reasonable doubt that both Miller and Monea had the requisite knowledge. There was evidence that Miller and Rizzo had a long-standing money-laundering relationship. As to Monea, during their very first meeting Monea assured Rizzo that he understood Rizzo's desire to place cash into "legitimate businesses." Later, the two men met at West Coast Customs and talked about Rizzo putting cash into that business and receiving payroll or consultant fees back. Although Monea and Rizzo did not enter into such an arrangement, by that point Monea certainly understood that Rizzo was looking to launder money. Monea later definitively learned that Rizzo purported to work for "huge drug dealers." Further, Miller was involved in the

discussions regarding the method of payment. In light of this evidence, a rational juror could conclude that Monea agreed to sell the diamond, and Miller assisted, with knowledge that the purchase was designed to conceal the illegal nature of the funds to be used to make the purchase. Accordingly, there was sufficient evidence to show that Monea conspired to violate § (a)(1)(B)(i).

3. **§ (a)(3)(B)**

Turning to the three substantive money-laundering counts, to sustain a conviction under § (a)(3)(B), the government must prove that Monea himself intended to conceal or disguise the nature, location, source, ownership, or control of illegally gained proceeds. In contrast to § (a)(1)(B)(i), knowledge of another's intent is insufficient. A court can infer intent based on a defendant's conduct.

> [A] variety of types of evidence have been cited by this and other circuits as supportive of evidence of intent to disguise or conceal. They include, among others, statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*United States v. Garcia-Emanuel*, 14 F.3d 1469, 1475-76 (10th Cir. 1994) (footnotes omitted). *See also United States v. Seher*, 562 F.3d 1344, 1364 n.22 (11th Cir. 2009) (jury could infer that defendant's actions showed an intent to conceal or disguise); *United States v. Marshall*, 248 F.3d 525, 539 (6th Cir. 2001) (citing *Garcia-Emanuel*).

Monea asserts that although he knew he was selling the diamond to drug dealers, he had no intent to conceal the transaction; his only purpose was to sell his valuable diamond and acquire some needed funds. In support of this argument, Monea relies on his refusal to accept cash, and his insistence on using a wire transfer because, he argues, he knew the source could be revealed.

The evidence of Monea's own intent to conceal is not overwhelming; still, a rational juror could have found that intent. Miller testified that he and Monea had a conversation in which they talked about "the problem" that the diamond proceeds might "be looked at by authorities," and "if it is looked at, who would answer for it." They resolved their concern by directing the funds to Monea's attorney's IOLTA account, to later go to the Monea Family Trust. A rational juror could infer an intent to conceal from Monea's routing the money through an extra step – the IOLTA account – not integral to the sale. Further, there was evidence that Monea's reluctance to accept cash was based solely on his apprehension that he was being looked at closely by the government, and that he would be unable to use the cash to pay his debts as he planned.[8] Monea suggested that Rizzo's principal pay for the diamond and Tyson estate with a larger boat or a plane that the principal wanted to get rid of, and spend the cash elsewhere to buy replacement boats and planes. Rizzo responded that the planes all go through United States dealers, and Monea replied, "Yeah, Miami won't take cash?" Monea continued, "My situation is special because I have to assume that everything I do is looked at." Rizzo then made clear that the purchasers were drug dealers; Monea responded, "Now why did you have to make a point to tell me that[?]" Rizzo answered that his principals were honorable, and that he wanted everything to be on the table. Monea's associate, Scott Ramsey, said "As long as their money is coming from somewhere legal, it's all good." Rizzo responded, "It's coming from wherever it comes from . . . and you guys deal with that and they have no problem with the wire transfer."

---

[8]Monea said in a taped conversation with Rizzo, "Yeah, I still will have and do have the same problem I had yesterday. I don't know what I can do with cash."

When Monea finally met with "Geraldo," Monea reiterated that he would take a boat as part payment, or an airplane. The negotiations focused on the sale of the diamond and the Tyson estate as a package:

Geraldo: How much for everything then? Give me a good deal, man.

Monea: I would make you a good deal. I'll tell you why I would make you a good deal. I mentioned to John [Rizzo] that I have the ability to get very, very large diamonds. Like hundred carat diamonds.

Rizzo: Raw.

Monea: I can get 'em either way. I can get them cut, uncut. Hundred twenty-four carat . . .
* * *
Monea: . . . So I have access uh . . . on a . . . on a go forward basis. I have access to these stones. If that would be something of interest . . .

Geraldo: Yeah, man . . . I like that. It's a good way. That's good.

Rizzo: (UI [unintelligible]) and that's why I think it's . . . it's a . . . an ongoing relationship would be good. For everybody. Because he could do that. And uh . . . keep that as an ongoing thing. As time passes.

Monea: Couple times a year.
* * *
Geraldo: So how much for everything then?

Monea: I would do uh . . . 20 and the boat. For the house and the stone.

Geraldo: How about the cash? Because you was telling me you wanted transfers. And that cost me money. I got to pay people to be able to transfer the money. I got to go to people that charge me four points, five points. What can you do with that? Can you help me with that?

Monea:	They charge you five points to move the cash?  I told John with the Homeland Security Act, you know what that is?  The Homeland Security Act.

[]

Monea:	They examine all wire transfers that come into the country now.  They wanna make sure that it's not coming from a terrorist organization.  They wanna make sure that the money's good.  So I have to assume that . . . I met with my attorney, he said Paul, he says I'm saying there's a possibility, not a probability, but there's a possibility that this money's gonna be looked at.  I said is that a problem?

Geraldo:	Uh . . . That's a problem for me.

Monea:	Said no, I says I represent the trust and I represent you.  And the diamond is for sale.  You have several people interested in it so it's fair market value for the diamond.  He says if you're selling it for fair market value, that's all that matters.

[]

Monea:	Yeah.  He said that . . . the mon[ey's] coming in his trust account.  He represents the trust.  It's an asset of the trust.  And we're selling the diamond . . . we're selling it for fair market value.  You don't really have the responsibility or an obligation to interview people to find out how they got the money.  It's not your . . . it's not your responsibility.  So I was satisfied with that. But cash is different.  I don't know how you can handle cash.  I don't know.  I'd have to report it if I got cash.

Rizzo:	Couldn't you take some time to . . . to even . . .

Monea:	I'd rather give him the five points.  I'd rather discount it by five points or two and a half and split it with him.  With the cost of moving the money.

Rizzo:	The cash is a concern.  Um . . . Because you know, we got the problem.  And that's a concern.  Uh . . .

Monea:	It'll cost you five points, I'll split that with ya.

* * *

Geraldo: So anyway man, I'm gonna have to go back to Miami to see how quickly my men can handle that. So, if we do twenty, plus the boat and we take five points . . .

Monea: Five points is a million. I'll split it with you.
[]
Monea: He pays five, I pay five.

Rizzo: So it's . . .

Monea: $19.5

Rizzo: $19.5 plus the boat

Geraldo: $19.5 plus the boat.

Monea: That is a good deal.

Geraldo: Come on man. Good deal. I'll give you twenty. Just take some cash

Monea: Pardon me?

Geraldo: Take some . . . some cash. It . . . it be better for me.

Monea: I'll pay the points.

Geraldo: I have a whole house that I can't get rid of[,] a whole house.[] (Laughs).

Monea: I don't know what . . . I don't know what to do with cash.

Rizzo: Um . . . you . . . you owe some things on the stuff, right? Can you pay those off in cash?

Monea: Well, eventually the cash is gonna get reported and eventually it's gonna come back to me and eventually it's gonna be out you deal in cash.
[]
Monea: I don't know if the guy would take cash (UI).
[]
Monea: I would ask him. But uh . . . I . . . think that we should proceed on the basis that he's gonna say no. If he says yes then (UI).

Geraldo: Okay, man. Okay.

[]
Monea: But cash is just really difficult for me right now.

Geraldo: Okay. Then let's do this.

Monea: When I can travel then it's a different thing. I just can't travel right now.

[A discussion about Geraldo making a $500,000 deposit and the money being held in the attorney's IOLTA account.]

Monea: I'll tell you why I want you going into my attorney's escrow account. Because my attorney represents the trust. And my attorney can legitimately represent the trust as a client of mine, Mister Monea's a client of mine and we're conducting the sale on behalf of the trust. And it keeps me clean.

[Negotiations continue over whether the price is $20 million or $19 million.]

Monea and Geraldo arrived at a price of $19.5 million, plus the boat, for the diamond and the Tyson property.

The jury could reasonably have inferred from this evidence that Monea was not just interested in selling the Golden Eye diamond and the Tyson property to raise needed cash, but was also interested in selling more diamonds in the future; that Monea's problem with payment in cash was that it might raise questions, not that he did not want to accept drug proceeds; and that Monea's willingness to pay half of the expense of "moving the money" by wiring through a bank revealed his own intent or design to make the wired funds look legitimate.

To be sure, Monea's and Miller's dominant motivation likely was to sell the assets to obtain much-needed cash. But, one can have multiple motivations for a single act or plan. There was evidence from which the jury could reasonably conclude that one of Monea's motivations in having the money wired into the IOLTA account was to avoid inquiry into the source of the money. While

it is certainly true that the records of the wire transfer would reveal who wired the money, the record would not reveal the illegal source of the money, or the true owner of the funds, the "major drug dealer."

The three substantive money-laundering counts were based on three wire transfers of funds into the attorney's IOLTA account. The jury could have reasonably concluded that the payment was structured this way by Monea in order to insulate himself from the transaction. It is, to be sure, unusual to base a money-laundering charge on a defendant's efforts to assure that a payment is made by wire, rather than with cash. However, what is relevant is Monea's intent. And there was sufficient evidence to support the jury's rejecting any argument that Monea's intent in insisting on the wire transfer was to assure that there would be a legitimate paper trail, or that he was simply indifferent to whether Rizzo and Geraldo intended or designed the transaction to disguise or conceal the nature or source of the funds, and instead finding that Monea affirmatively intended that the wire to the lawyer's IOLTA account aid in concealing and disguising the fact that money being wired was drug proceeds. There was evidence that Monea thought that the transaction was more likely to look innocent if the money was wired into the attorney's account. There was also evidence that Monea was willing to pay $500,000 to assure that the transaction was structured this way.[9]

It may seem like a Catch 22 to say that a seller of his own legitimate assets is guilty of money laundering because he refuses to accept illegal cash and insists that the transaction be conducted in a traceable fashion. After all, it is not illegal under this statute to knowingly engage in a transaction involving money that is only represented to be illegal proceeds, but is not in fact. Criminal liability

_____

[9]Monea would characterize his actions as demonstrating his insistence that the transaction be conducted in a legitimate fashion and his willingness to take less money to assure that it be done that way. The jury could have viewed his actions as demonstrating his insistence that the transaction be made to look like it involved legitimate funds, and a willingness to bear half the cost of making it so appear.

only attaches in such circumstances if the defendant has the intent to conceal or disguise the source or nature of the funds. Thus, one who only wants to sell his assets and does not intend to assist in concealing or disguising the illegal source or nature of the purchaser's funds might very well insist that the purchase price be paid by check or wire, or some other manner that does not disguise the source or nature of the funds. The difference here, however, is that there was evidence that Monea himself very much wanted to avoid any scrutiny of the transaction, and had his own intent to conceal the source of the funds. He sought to have the buyer pay in already-laundered proceeds – a jet, a larger boat, proceeds of another business – and when that was not possible, he was willing to share the cost of Geraldo's need to "pay people to be able to transfer the money," "people that charge . . . four points, five points." The evidence supports that Monea understood that this was not a simple wire transfer: he responded, "They charge you five points to move the cash?" and then agreed to pay half the cost.

Monea's words support the understanding that the transaction was designed to make the money look legitimate. He explained why he insisted that the money be wired. He believed he had no obligation to "interview people to find out how they got the money . . . but cash is different. I don't know how you can handle cash. I don't know. I'd have to report it if I got cash . . . I'd rather give him the five points. I'd rather discount it by five points or two and a half and split it with him, with the cost of moving the money."

Accordingly, there was sufficient evidence at trial to convict Monea of money laundering in violation of 18 U.S.C. § 1956(a)(3)(B).

## B. Entrapment

Monea argues that the district court erred in declining to find that he was entrapped as a matter of law and allowing the question of entrapment to go to the jury. Where (as here) a defendant

presents some evidence of inducement, the government then bears the burden of proving beyond a reasonable doubt that the defendant had a predisposition to commit the crime. *See United States v. Jones*, 575 F.2d 81, 83 (6th Cir. 1978). Entrapment is established as a matter of law if the undisputed evidence demonstrates that "government agents engaged in conduct which overbears an otherwise innocent person's will and thereby induces him to commit a criminal act that he was not disposed to commit." *United States v. McLernon*, 746 F.2d 1098, 1111 (6th Cir. 1984) (citation omitted). Because entrapment is generally a question for the jury, in order for a defendant to establish that he was entrapped as a matter of law, "the testimony and the facts must be undisputed," and must demonstrate a "patently clear absence of predisposition." *United States v. Harris*, 9 F.3d 493, 497-98 (6th Cir. 1993). The evidence must be viewed in the light most favorable to the prosecution. *Id.*

Predisposition is "the defendant's state of mind before his initial exposure to government agents." *McLernon*, 746 F.2d at 1112 (citation and emphasis omitted). This Circuit has identified five factors relevant to determining whether a defendant is predisposed to committing a crime: 1) the character or reputation of the defendant, including any prior criminal record, 2) whether the suggestion of the criminal activity was initially made by the government, 3) whether the defendant was engaged in the criminal activity for profit, 4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated government inducement or persuasion, and 5) the nature of the inducement or persuasion supplied by the government. *See United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1999).

Monea argues that because Rizzo did not know him before Miller introduced them, the government had no knowledge of his character or reputation before it induced him. Although Monea admits that he had been convicted of tax evasion, he contends that his conviction is not relevant for

predisposition purposes because tax evasion and money laundering are too dissimilar. Monea contends that Rizzo's expressed wish to "legitimize" his cash through a business was the first suggestion of criminal activity, and that after Monea learned of Rizzo's purpose, he did not talk to Rizzo about investing in the project again. Monea argues that initially he declined to work with Rizzo, and that only after the government -- knowing he was desperate for money -- contacted him months later and made him the offer of millions of dollars to sell both the diamond and the Tyson house, did he give in. We find no error in the district court's submitting the issue to the jury.

Applying the factor analysis, the first issue is Monea's character/reputation. Monea was convicted of tax evasion in 2003, served time in prison, and was on supervised release during the events of this case. There is no requirement that a government agent know beforehand about the defendant's criminal history in order for it to be considered. However, in order to be relevant, the past crimes must be similar to the present crimes: "where entrapment is in issue evidence of prior crimes is not relevant unless it tends to prove that defendant was engaged in illegal operations in some way similar to those charged in the indictment." *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985) (citations omitted) (adopting Ninth Circuit's rule).

The district court concluded that tax evasion and money laundering are "sufficiently similar" because both involve concealing money from the government. *See United States v. Monea*, No. 1:07CR30, 2008 WL 731100, at *9 (N.D. Ohio Mar. 17, 2008) (unpublished). However, this court has rejected a broad view of similarity of crimes. *See Blankenship*, 777 F.2d at 740 ("Proof that the defendant has committed thefts in the past and is willing to share in the proceeds of a projected burglary has little if any probative value with respect to the issue of his predisposition to receive, possess or deal in firearms."); *see also Sherman v. United States*, 356 U.S. 369, 375 (1958) (defendant's nine-year-old narcotics conviction and five-year-old narcotics possession conviction

"are insufficient to prove petitioner had a readiness to sell narcotics at the time" he was approached by the government). Accepting Monea's dissimilarity argument simply for the sake of argument, there was other evidence of Monea's character and prior activities that support the court's decision to submit the issue to the jury. Monea told Rizzo that he had dealt in cash before, selling boats to drug dealers for cash. Although Monea attempted to negate this statement at trial, his character as relevant to the entrapment defense was properly a matter for the jury.

Concerning the second consideration, the record shows that both Monea and Rizzo played "initiating" roles in pursuing or discussing various criminal activities. Although the government did not seek out Monea (Rizzo was introduced to Monea by the initial target of the government's efforts, Miller), Rizzo was the first to raise the issue of money laundering generally by telling Monea at their first meeting that Rizzo had a lot of money he needed to move into legitimate businesses. As Monea and Rizzo continued their discussions, they considered a few potential arrangements. The record shows that after Monea said he understood that Rizzo needed to place cash into legitimate businesses, he attempted to initiate follow-up contact with Rizzo. Monea first mentioned that he had a friend at West Coast Customs, and that he was thinking about how he could use the friend. Monea also revived the subject at a later meeting by asking Rizzo if he wanted to talk about going into business together. But Rizzo first initiated the West-Coast-Customs-specific portion of that conversation by reminding Monea that he was going to talk to the owner about "tak[ing] cash through the business." Then both men discussed the plan that Rizzo would park cash in the business and, in turn, the business could pay him as a consultant. With regard to the sale of the diamond, Monea first mentioned that he had the very valuable diamond, and that it was for sale. But Rizzo raised the possibility of his associate purchasing the diamond. In sum, the evidence was not so one-sided as to establish entrapment as a matter of law.

Third, Monea was engaged in the criminal activity for profit. The record is clear that Monea was in dire financial straits after leaving prison. He maintains that the previous trustee of his family's trust stole all assets except the diamond and the Tyson property; he had liens on his properties. Monea developed the "Tyson's House Party" idea in order to make some money on the property. He had given Miller instructions on how to divide up the funds he was to receive on the diamond so that he could satisfy the significant obligations and debt he owed. It is not clear which way this evidence cuts, however. Monea's profit motive could imply predisposition. But, taking into account Monea's desperate need for funds, combined with Rizzo's knowledge of Monea's situation, this evidence might also be understood to show the government's substantial inducement. *See McLernon*, 746 F.2d at 1112-13. In any case, this factor does not establish entrapment as a matter of law.

The fourth and fifth factors – whether Monea was reluctant to commit the offense and the nature of the government's inducement or persuasion – can be analyzed together. Although Monea maintains that he was reluctant to strike a deal with Rizzo, the record instead largely portrays Monea as being merely reluctant to deal in cash. Cash aside, there is evidence indicating that Monea was not reluctant. Although Rizzo did not launder money through Monea's "Tyson's House Party" project, when meeting with Rizzo regarding the project, Monea said he understood that Rizzo needed to place cash into legitimate businesses. Monea wanted to know how much money Rizzo was "trying to put into things that can generate long-term income [for] you from real businesses." After Rizzo told him "a couple million," Monea said he would "put [his] thinking cap on." After that meeting, Monea attempted to contact Rizzo. Later, the two men met at West Coast Customs and talked about putting cash into that business and Rizzo receiving payroll or consultant fees back. After Rizzo disclosed that his principals trafficked in narcotics, Monea replied that he did not see

that as a problem, and noted that he used to build boats in Miami and sell them to drug dealers for cash. Although Monea and Rizzo did not end up laundering money through West Coast Customs, Monea knew by then that Rizzo worked with "huge drug dealers" from South America who wished to legitimize their funds. Monea later agreed to sell the diamond and the Tyson property to these individuals, with Rizzo as their representative. Further, he made a point of telling them that he had access to more diamonds, large and small.

On this record, the court did not err in concluding that Monea did not establish that he was entrapped as a matter of law, and that the jury could reasonably conclude that the government produced sufficient evidence that Monea was predisposed to commit money laundering. Even setting aside his criminal past, Monea demonstrated a willingness to launder funds with Rizzo. In reaching this conclusion, we reject Monea's argument that the government's $19.5 million offer was so large that the inference of predisposition that one would normally draw from his accepting the offer is negated. *See McLernon*, 746 F.2d at 1113. Because Monea had already demonstrated a willingness to launder money through West Coast Customs, this argument is unpersuasive. *See United States v. Kaminski*, 703 F.2d 1004, 1008 (6th Cir. 1983) ("A large inducement, however, is not proof in and of itself that defendant was not predisposed to commit the offense."). Similarly, we reject Monea's argument that because the government took the first step, any "post inducement evidence" is tainted by the strong arguable inference that the government excited Monea's interest in the first place. *See Jacobson v. United States*, 503 U.S. 540, 552 (1992). This argument, too, is unpersuasive given the facts. In *Jacobson*, the government used five fictitious organizations and a fake pen pal over the course of 26 months to induce a previously law-abiding citizen to order pornographic materials. *Id.* at 543. Rizzo's conduct here is not comparable.

Accordingly, the district court did not err in submitting the issue of entrapment to the jury.

## C. Denial of Motion to Continue Trial

Monea contends that the district court erred in not granting a continuance of the trial start date. Monea argues that there were problems with the recordings provided by the government. In particular, "crucial" conversations were barely audible and the government had transcribed only a portion of the recordings. Monea contends that although it was possible to enhance the recordings, enhancements "could not be completed in time to be effective for use at trial." Thus, he argues, the district court improperly rushed the case to trial. We disagree.

We review the district court's decision to deny a motion for a continuance for abuse of discretion. *See United States v. King*, 127 F.3d 483, 486 (6th Cir.1997). The Speedy Trial Act sets out factors a court is to consider when deciding whether to grant an ends-of-justice continuance, including whether the case is so unusual or complex due to the nature of the prosecution, or due to the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation within normal time limits, and whether, even if the case is not so complex, denying a continuance would deny diligent counsel the time necessary for effective preparation. *See* 18 U.S.C. § 3161. Upon review, the general inquiry is whether the denial of a continuance is so arbitrary that it prevented the defendant from receiving a fair trial. *See generally United States v. Garner*, 507 F.3d 399, 408 (6th Cir. 2007). There is no mechanical test to guide the inquiry; this court must evaluate "the circumstances present in every case, particularly [] the reasons presented to the trial judge at the time the request is denied." *See id.* (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

Monea's original indictment was returned January 9, 2007, and his trial was set for March 19, 2007. On March 7, 2007, a superceding indictment was returned adding counts pertaining to Miller only; the district court adjourned the trial to April 23, 2007. On March 27, 2007, Monea filed an ends-of-justice motion to continue the trial, which the government did not oppose. The district

court continued the trial until May 14, 2007, although it stated it was only doing so out of "an abundance of caution." In its April 6, 2007, six-page order, the court evaluated the § 3161 factors and found that none of them favored a continuance. The court noted that Monea had three attorneys,[10] and that the case was not unusually complex, as it was typical of many money laundering prosecutions, had only two defendants, and did not involve any novel questions of fact or law. The court noted the two facts potentially supporting a continuance – that the case involved a substantial number of recorded conversations for counsel to review, and that the government stated that it still had about 100 documents to produce at that time – but still concluded that "in the exercise of due diligence, there is reasonable time for effective preparation and counsel can be fully prepared for trial in this matter."

Twice more before his May 14th trial, Monea filed motions to continue the case. Both times the district court denied the motions without further explanation. Review of Monea's two additional motions reveals that they are quite similar to each other, and to the original motion he had filed on March 27th. Notwithstanding that the district court rejected the claim that the case was complex in Monea's first motion, Monea pressed the argument in the two subsequent motions. Monea cited the number of recordings, their poor condition, and the need for a continuance to resolve the problem. Monea never specified what steps he had taken to improve the tapes in the more than one month that had elapsed from his first motion to his last, whether the enhancing had actually begun, or when the enhanced recordings would be complete. Monea's final two motions for continuance did contain some new material in support of the request. Monea's April 20th motion stated that he had just received the "final recordings" from the government two weeks earlier, and also noted that one of

_____

[10]This was true at the time. One of Monea's attorneys, however, successfully moved to withdraw from the case April 17, 2007.

Monea's three attorneys had recently asked to withdraw. Monea's May 1st motion complained that, only a few days before, the government had identified additional evidence that it would seek to introduce at trial concerning other individuals who had partial claims to the diamond. Still, these arguments are not sufficiently compelling to establish that the district court abused its discretion in ultimately rejecting them. The district court's orders make clear that Monea had received "most" of the relevant recordings months before trial and "virtually all" of them as of April 3, 2007. Further, Monea does not explain why any of the later-received materials fall outside of the realm of additional documents that a diligent attorney must incorporate into his or her preparation in the weeks leading to trial. Finally, Monea has not shown that the lack of additional time to examine these materials prejudiced his defense. *See Garner*, 507 F.3d at 408 ("To demonstrate reversible error, the defendant must show that the denial [of a continuance] resulted in actual prejudice to [the] defense.").

In light of the district court's thorough evaluation of Monea's original request for continuance and reasoned explanation for its denial, Monea has not shown that the district court abused its discretion in its rulings on his original motion for continuance and subsequent continuance requests.

**D. Additional Evidence Regarding Recording Tampering**

On October 15, 2007, several months after trial, the district court held a hearing regarding Monea's accusation that a government recording of Monea and Rizzo had been tampered with. Monea had maintained at trial that he had been afraid to back out of the deal, and asked that the court instruct the jury regarding coercion and duress. In a post-trial motion for acquittal/new trial, Monea contended that during the few seconds of a recording of a November 2, 2006, conversation in which

there was an "anomaly" in the sound, Rizzo may have threatened him. Monea claimed he had evidence that the recording may have been intentionally edited.

At an evidentiary hearing on the issue, Monea presented three witnesses, all non-experts, who testified that there was an audible click in the recording, which likely represented approximately two seconds' worth of conversation that had been somehow edited or deleted. Although Monea attempted to elicit expert conclusions from the witnesses, they were not qualified in audio forensics or forensic examinations, and did not know what recording device had been used. The government presented three fact witnesses who testified to the chain of custody of the recording during the four days before it was downloaded, and that, for all practical purposes, the wearer of the recording device cannot turn it on and off while wearing it. The government also presented two expert witnesses familiar with the recording device who testified that it would be extremely difficult, and require specialized knowledge and equipment, to alter the recording after it was downloaded without being detected.

Over a month later, Monea filed a post-hearing brief, attaching the affidavits of two (potential) experts who concluded that the recording was altered or edited. In the brief, Monea requested the opportunity to present additional expert testimony on the issue. The district court denied the request in its March 17, 2008, opinion denying Monea's motion for acquittal/new trial.

On appeal, Monea essentially argues that he did not know that the October 15, 2007, hearing would be his only opportunity to present supporting evidence on the recording issue. Monea argues that the district court abused its discretion in refusing him an evidentiary hearing to present his two experts, and in refusing to allow his experts to examine the government's recording equipment.

1. **District Court's Rationale**

In rejecting Monea's request, the district court noted the shortcomings of the non-expert evidence that Monea had presented at the previous hearing and also analyzed in detail the affidavit of James Reames, the more qualified of the two proposed experts:

> Defendant's final proposed expert was James B. Reames, a former employee of the FBI who had worked with sound recordings and who now is the president of a forensic laboratory that analyzes audio recordings, among other things. He has opined that the November 2 recording does contain an anomaly. Mr. Reames states that an occurrence such as this can be caused by: "(1) a change in the recording environment; (2) a recording system malfunction; and/or (3) editing or altering the recording." (Defendant's Post-Hearing Brief and Motion for Further Evidentiary Hearing, Exhibit E, para. 8.) Mr. Reames claims that, based on his training, experience, and examination, there is no change in the recording environment, thus eliminating the first possible cause. He next states that he "did not find evidence of a recording system malfunction." *Id*. He bases these conclusions on the mere fact that he found the recording before and after the purported anomaly to be normal.
>
> After eliminating to his satisfaction the possibility of environmental disturbances, Mr. Reames contends that the recording was either altered or was subject to a malfunction. In an effort to eliminate the latter, Mr. Reames suggests that if the digital recorder were made available to him, along with its manuals, he could determine if the recording is working correctly or if it is prone to malfunctions. He also requests that the Government make available to him a mirror of the hard drive from the computer that was used to download the recording.
> . . .
> Although Mr. Reames's qualifications are greater than any of the other so-called experts produced by Defendant, there is not enough evidence before the Court to justify its ordering the FBI to make a mirror hard drive for Mr. Reames's inspection or to produce the digital recorder for inspection by anyone outside of the Government.

The court based its denial on 1) the government's argument that the recording device is "top secret" and not available for public inspection due to the danger that the appearance and characteristics of the device may become well known and threaten the safety of undercover agents using it, and 2) its determination that Monea did not present the "extraordinary circumstances in which more substantial evidence ha[s] been produced" that would cause the court to require a "mirror" hard drive to be made.

### 2. Analysis

This court's review is for abuse of discretion. *See United States v. Kuehne*, 547 F.3d 667, 693 (6th Cir. 2008). The fact that the district court thoroughly considered Monea's experts' affidavits ameliorates both Monea's complaint that because of his misunderstanding about the nature of the October 15, 2007, hearing, he was denied the opportunity to present expert testimony for the court's consideration and his claim that the court abused its discretion in denying an evidentiary hearing.

In any event, the district court offered an additional reason for concluding that it did not require further defense evidence concerning the anomaly. The court found that Monea's enthusiasm to engage in the transaction (in conversation after the "anomaly") demonstrated that, on the whole, he was a willing participant, rather than one who was coerced by recent threats. We conclude the district court did not abuse its discretion.

### E. Jury Instructions

#### 1. Monea's Prior Conviction

Monea requested that the court instruct the jury that it may not consider Monea's prior conviction of tax evasion as evidence of his predisposition to commit money laundering. The district court declined, reasoning that 1) under *Blankenship*, the crimes of tax evasion and money laundering are sufficiently similar that Monea's conviction could be considered, and 2) its broader instruction concerning "other acts" of a defendant adequately stated the law concerning, among other things, Monea's tax-evasion conviction. Monea argues that the district court erred in not adding his instruction, and that consequently the remaining instructions concerning a defendant's prior acts and entrapment were misleading.

The failure to provide a requested jury instruction is reviewed for abuse of discretion. *See United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006). "No trial error, including an erroneous jury instruction, will compel reversal of a conviction unless the defendant(s) can prove either that the alleged misconduct [or error] was inherently prejudicial or that it caused actual prejudice." *United States v. Carney*, 387 F.3d 436, 449 (6th Cir. 2004) (citation and quotation marks omitted); *see also Blood*, 435 F.3d at 623 ("Harmless errors are disregarded."). As noted above, in *Blankenship*, this court held that "where entrapment is in issue evidence of prior crimes is not relevant unless it tends to prove that defendant was engaged in illegal operations in some way similar to those charged in the indictment." 775 F.2d at 739 (citation omitted). As before, we need not definitively conclude whether Monea's tax evasion conviction may be considered evidence of predisposition. Assuming, arguendo, that the tax evasion offense is not sufficiently similar under *Blankenship*, Monea cannot show the required prejudice – even disregarding Monea's criminal history, the jury had ample evidence before it that Monea was predisposed to commit money laundering, and was likely unaffected by evidence of the prior conviction. Thus, the district court's allowing the jury to consider Monea's conviction, even if error, does not require reversal.

### 2. Coercion and Duress

Monea also requested that the jury be instructed on the defense of coercion and duress. The district court considered the five factors required to establish the defense of duress, and concluded that there was insufficient evidence to support the instruction.

Monea correctly observes that the standard for determining whether there is sufficient evidence to warrant an instruction is not high. When a theory of defense "finds some support in the evidence and in the law, a defendant is entitled to some mention of that theory in the instructions." *United States v. Garner*, 529 F.2d 962, 970 (6th Cir. 1976). Even if the evidence is "weak or of

doubtful credibility its presence requires an instruction on the theory of defense." *Id.* However, the

defense of duress requires a showing on *five different elements*:

> (1) that defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
> (2) that the defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;
> (3) that the defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm;
> (4) that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm;
> (5) that defendant did not maintain the illegal conduct any longer than absolutely necessary.

*United States v. Johnson*, 416 F.3d 464, 468 (6th Cir. 2005) (emphasis omitted).

The strongest evidence Monea cites to show his fear is Rizzo's November 2, 2006, statement

concerning the purchaser, made immediately before Monea met with the purchaser to negotiate the

sale of the diamond:

| Rizzo: | . . . I don't wanna propose that I put you with them and everything goes well and then you have second thoughts after I vouch for you and committed. Okay? |
|---|---|
| Monea: | I understand how that works. |
| Rizzo: | Because that alone would make me look bad, they're gonna say . . . |
| [] | |
| Rizzo: | . . . They're gonna say wait a minute, you bring this to the table and hen afterwards your guy . . . it doesn't mature. It doesn't happen. look bad. So if you feel comfortable after today[,] |
| Monea: | Yeah. |
| Rizzo: | Then . . . and we go forward . . . we gotta go forward. |

While this exchange does show Rizzo putting some pressure on Monea, the qualifier that Monea

should "feel comfortable" before committing to the sale makes it less than a threat. Presumably

Monea could still decide he did not feel comfortable and back out without consequence. Additionally, there are many hours of recordings of conversations between Rizzo and Monea, but only one such exchange. In context, there is no real evidence to support the argument that Monea was coerced into agreeing to sell the diamond, and then was too fearful to back out.

Monea also suggests his own statement that "[w]e'd all be dead" when talking with Rizzo about what would happen if he pursued the sale and the diamond was a fake, is evidence that Monea felt threatened by the buyers. But, in context, this is not a realistic interpretation of the statement. First, this conversation took place on October 17, 2006, well before there was any actual progress on the diamond sale. Rizzo's statement to Monea warning Monea not to pursue the sale if he was not comfortable – indicating he still had a choice about whether to pursue the sale – occurred the following month. Second, review of the whole conversation reveals that Rizzo, not Monea, is the individual exhibiting nervousness about a potential diamond sale involving his boss. At several points in the conversation, Monea appears to be reassuring Rizzo of Monea's own comfort in order to keep the potential sale moving forward.[11] To the extent this conversation exhibits Monea's

---

[11]The few exchanges after the "we'd all be dead" statement provide a good example ("UI" stands for unintelligible):

Rizzo:      . . . Anyway, It's got to be right because . . .

Monea:     (UI) We'd all be dead (UI).

Rizzo:      I'm just saying it wouldn't be good. I do not . . .

Monea:     I got papers.

Rizzo:      I know but . . .

Rizzo:      Okay, I got papers too. I'm just telling you. He can
            do it, but if anything is wrong. I'm telling you
            because this guy makes me nervous.

relative comfort with the sale and the individuals participating in it, it is consistent with Monea's various statements in the record indicating that he had experience with drug dealers and other dangerous businessmen before, and that he had learned how to best interact with them.

Finally, even assuming that Monea's interpretation of the statements is plausible, the evidence only pertains to the first of the five necessary factors. *See United States v. Oguaju*, 234 F.3d 1270 at *5-6 (6th Cir. 2000) (unpublished) (district court correctly refused duress jury instruction where defendant only showed evidence of one of the five factors). As such, the district court did not abuse its discretion in declining to instruct the jury on duress.

## F. Sentence Calculation

Monea raises only one claim concerning his sentence – that the district court erred in calculating his base offense level under the Guidelines when it assigned a 20-level increase based on the amount of money involved. Monea contends that his base offense level should have been calculated using $100,000, the amount of deposit money that was actually wired into his account,

---

| Monea: | (UI) Just tell him you know me. |
| Rizzo: | I'm just saying if anything is wrong. |
| Rizzo: | My cousins for four generations will have problems. |
| Monea: | No, (UI), You don't have to worry about that. |
| Rizzo: | Okay. |
| Monea: | (UI) Is there any way we can meet you in New York[?] |

In general in the conversation, Monea seems eager to reassure Rizzo that the diamond is legitimate, and to complete the sale as soon as possible. Albeit, at a later time Miller commented that Rizzo seemed more anxious to complete the sale than Monea.

rather than $19.5 million, the negotiated amount that was never actually transferred to Monea. Monea sufficiently raised this objection at sentencing.

We review the district court's determination of facts concerning the amount of money involved in a money-laundering scheme under a clearly erroneous standard; *de novo* review applies to the district court's legal conclusions regarding the Guidelines. *See United States v. Anderson*, 526 F.3d 319, 323 (6th Cir. 2008).

United States Sentencing Guideline § 2S1.1 is used to calculate the base offense level for money-laundering offenses. Under the relevant portion of the Guideline, a defendant's base offense level is "8 plus [the] number of offense levels from [the table in § 2B1.1] 'corresponding to the value of the laundered funds'." *United States v. Harmon*, 409 F.3d 701, 706 (6th Cir. 2005) (quoting U.S.S.G. § 2S1.1(a)(2)). Looking to the referenced table, a loss of $19.5 million corresponds to a 20-level increase, while a loss of $100,000 corresponds to an 8-level increase. U.S.S.G. § 2B1.1(b)(1). Monea acknowledges that Application Note 3A to § 2B1.1 defines "loss" for purposes of the Guideline as "the greater of actual loss or intended loss" and that his intended loss was $19.5 million. But Monea argues that the key is that § 2S1.1, the Guideline that applies to money laundering, defines the term "laundered funds" as "the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. 1956 or 1957." *See* U.S.S.G. § 2S1.1, cmt. n.1. Monea notes that there is no alternative "intended" definition. He maintains that because he was convicted of money laundering, the § 2S1.1 language applies, leaving him accountable only for the funds that were actually involved in the transaction.

We are unaware of any authority speaking to this precise issue. A central problem for Monea's position is that although he claims that the "laundered funds" considered by § 2S1.1 are

only the funds actually transferred ($100,000), the Guideline definition of laundered funds includes not just amounts actually transferred or transmitted, but amounts "involved in the transaction." *See* U.S.S.G. § 2S1.1, cmt. n.1. The $19.5 million was not transferred or transmitted, but it was "involved in the transaction" in the sense that it was the amount that the government agreed to pay and Monea agreed to accept. Adopting Monea's position on the proper amount under the Guidelines would mean that in sting operations a defendant's sentence would depend entirely on how much the government happened to have actually given (or shown to) the defendant, rather than how much the defendant agreed or intended to take. In an analogous context, a sister circuit has considered these problems and rejected a claim similar to Monea's. *See United States v. Barton*, 32 F.3d 61, 65 (4th Cir. 1994) (declining to hold, for precisely these reasons, that "sentencing courts are limited to considering just the amount of flash money in fact-finding to determine the 'value of the funds' for enhancement purposes under [a former version of another guideline provision]"). We find no error in the court's application of the Guideline.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM**.